## MELCHERT *v.* AMERICAN UNION TELEGRAPH CO.

(*Circuit Court, D. Iowa.* January Term, 1882.)

OPTION DEALS.

Contracts for the sale of property to be delivered at a future time at the plaintiff's option, where it was not the intention of the parties that the property should be delivered either by consignment or the transfer of warehouse receipts, but that said contracts should be adjusted and settled by the payment of differences, are void.

This case was submitted by counsel to the court for trial without a jury. It is an action in which the plaintiff claims damages resulting from the alleged negligence of the defendant in transmitting a telegram from Davenport, in the state of Iowa, to the plaintiff's factor in Chicago. It appears that the plaintiff had, in the months of July and August, 1880, made, through his factor in Chicago, certain contracts for the sale of some 15,000 bushels of rye at $65\frac{1}{2}$ and $68\frac{1}{2}$ cents, to be delivered at the plaintiff's option during the month of September in the same year. On the eighth day of September, 1880, the plaintiff delivered to the operator of the defendant's line, at Davenport, at 10 o'clock A. M., a dispatch directed to his factor operating on the board of trade, Chicago, a message directing him to "cover rye as best he could," suggesting "that if he could buy cash he could save more;" adding, "if possible, cover immediately." It does not appear that the plaintiff gave any explanation to the operator of the object, importance, or meaning of the telegram, and it is evident that the operator was wholly uninformed as to the contracts of July and August. The defendant's direct line to Chicago being in trouble, the operator sent the message over its line indirectly by way of Omaha and St. Louis. The message, in the regular course, would have reached Chicago in 10 or 15 minutes from the time of its transmission at Davenport; but it did not, in fact, reach its destination till 2 o'clock and 45 minutes in the afternoon. It was delayed in the office at St. Louis in consequence of some trouble in the defendant's line between that city and Chicago. The operator at Davenport received the message without notifying the plaintiff that the direct line was in trouble, and it does not appear that the office at St. Louis informed the office at Davenport of the delay occurring there. The plaintiff was in the defendant's office at Davenport in the course of the day, manifesting anxiety about the message, but received no in-

formation from the defendant's employes about the delay or the cause of it. The office of another telegraph line, over which the message could have been sent, was near at hand, but the plaintiff, not knowing of the delay, did not, of course, resort to that line. It appears that when the message reached the plaintiff's factor in Chicago the board of trade had adjourned for that day, and that it was then too late to do what the message directed to be done. The factor understood the message to direct him to purchase rye on the board of trade to cover the contracts of July and August. The price of rye required for that purpose was, on the board of trade, 80 to 83 cents per bushel up to the time of the adjournment, on the eighth of September. Of course, no rye was purchased in pursuance of the telegraphic message on the eighth of September. Rye advanced on the ninth of September to 85 cents per bushel, and on the 9th and 10th the plaintiff's factor settled the contracts of July and August by "paying the differences in money value." The result was that the plaintiff lost the differences between 80 cents per bushel and 85 cents upon 15,000 bushels of rye, amounting to $750; which sum he claims as damages in this action.

*Stewart & White*, for plaintiff.

*S. E. Brown*, for defendant.

LOVE, D. J. Several questions were argued at the bar, which, with my view of the case, I consider it unnecessary to decide. There is one view which is, in my judgment, entirely conclusive of the controversy. Assuming that the alleged negligence has been satisfactorily established, it is evident that we must proceed to inquire whether or not the contracts of July and August, 1880, were valid and binding agreements, which the plaintiff was required by law to fulfil. The telegram of September 8, 1880, instructed the plaintiff's agent to "cover rye," and it now clearly appears that these words referred to the two contracts for the sale of rye, to be delivered in September, at the plaintiff's option. The purpose of the telegram was to provide for the fulfilment of these contracts. If they were illegal contracts, the plaintiff was not bound to fulfil them, and he could have suffered no loss from the failure to fulfil them. Nay, if these contracts were illegal gambling contracts, within the statute laws of Illinois, it was the plaintiff's plain duty not to fulfil them, and he cannot complain of the defendant's telegraph company that they were not sufficiently diligent in aiding him to perform his unlawful agreements. The contracts in question were for the delivery of

rye in the month of September, at the seller's option. A contract for delivery at the seller's option may be valid or invalid. It depends upon the nature of the option as shown in the intention and purpose of the parties. The option may refer to the fact of delivery, or merely to the time of delivery. If it be the intention of the parties that the property shall be in fact delivered, giving the seller's option as to the time of delivery within a certain period, I see no valid objection to such a contract. It is but a contract for sale of property to be delivered in the future, within a given time. But if it be not the *bona fide* intention of the parties that the property shall be in fact delivered in fulfilment of the contract of sale, but that the seller may, at his election, deliver or not deliver, and pay "differences," then the contract is void. Such a dealing amounts to a mere speculation upon the rise and fall of prices. It required no capital, except the small sums demanded to put up margins and pay differences. It promotes no legitimate trade. Any impecunious gambler can engage in it, with infinite detriment to the *bona fide* dealer. It enables mere adventurers, at small risk, to agitate the markets, stimulate and depress prices, and bring down financial ruin upon the heads of the unwary. It enables the unscrupulous speculator, with little or no capital, to oppress and ruin the honest and legitimate trader. Corners and black Fridays and sudden fluctuations in values are its illegitimate progeny.

The supreme court of Illinois, in *Pickering* v. *Chase*, held that contracts where the seller has the privilege of delivering or not delivering, and the buyer the privilege of calling or not calling for, the grain, just as they choose, are optional contracts in the most objectionable sense. 79 Ill. 328. The question is, what was the intention of the parties in the inception of the contract? For if, in its inception, the contract was *bona fide*—if it was the true intent of the parties that the property should be in fact delivered—it could be no valid objection that they afterwards, at the time for delivery, arranged the controversy between them by the payment of the difference between the contract and market prices. Nevertheless, the subsequent conduct of the parties in dealing with the contract—in adjusting, settling, or fulfilling it—may often, as evidence, cast strong reflected light upon their original intentions in making it.

The contract now in question was made in Chicago, and, being an Illinois contract, its validity must be determined by the law of that state. In the Criminal Code of that state we find the following:

"Whoever contracts to have or give to himself or another the option to sell ·or buy at a future time any grain or other commodity, stock of any railroad or other company, shall be fined not less than $10 nor more than $1,000, or confined in the county jail not exceeding one year, or both; and all contracts made in violation of this section shall be considered gambling contracts, and shall be void." Rev. St. 1874, pp. 372, 373, § 138.

In the case of *Tenny* v. *Foot*, Legal News, November 16, 1878, p. 71, Judge McAllister, speaking of the statute, says:

"The statute was passed from motives of public policy, and to repress an evil; hence it follows, from established rules of law and their analogies in such cases, that, no matter what form the transaction bears as to the terms of the contract, still, if such form be colorable only, and the real intention of the parties be that there is to be no sale of the article—no delivery or acceptance of it—but the transaction is to be adjusted only upon differences, it is a gambling transaction within the statute."

What, then, was the intention of the parties to the contract in question as to the delivery of the rye? Was it their purpose in making the contract that there should be delivery of the grain, either by consignment, or by purchase in store and transfer of warehouse receipts? Or was it their intention that the contract should be fulfilled by putting up margins and paying differences, without any delivery whatever?

In seeking to ascertain the intentions of parties to such transactions as the one under consideration, it is evident that it will not do to place any great stress upon the mere terms of their contract, or upon their own declarations, whether under oath or not. Parties to such contracts will always seek to give them the form and semblance of legality, and all our experience admonishes us to receive with extreme caution, if not absolute distrust, what parties charged with transactions apparently illegal say respecting the innocency of their own intentions.

In this connection it will not be amiss to advert to the just and pertinent observations of Chief Justice Cole, of the supreme court of Wisconsin, in *Barnard* v. *Backhaus*, found in the Northwestern Reporter of July 23, 1881, p. 596.

"But it is the manifest duty of the courts to scrutinize closely these time contracts, and determine whether they are really intended by the parties to be what their language imports,—real contracts for the future delivery of grain,— or whether, in fact, they are mere bets or wagers on the price at some distant day. It will not do to attach too much weight or importance to the mere form of the instrument, for it is quite certain that parties will be astute in conceal-

ing their intentions, and the real nature of the transaction, if it be illegal. It may safely be assumed that parties will make such contracts valid in form; but courts must not be deceived by what appears on the face of the agreement. It is often necessary to go behind or outside of the words of the contract—to look into the facts and circumstances which attended the making of it—in order to ascertain whether it was intended as a *bona fide* sale and purchase of property, or was only colorable. And to justify a court in upholding such an agreement, it is not too much to require a party claiming rights under it to make it satisfactorily and affirmatively appear that the contract was made with actual view to the delivery and receipt of the grain; not as an evasion of the statute against gaming, or as a cover of gambling transactions."

We must look at the actions of interested or accused parties, rather than their mere words, to ascertain their real intentions. We must consider what they have done, rather than what they have said, when called to account for their actions. We can best learn what interpretation the parties themselves have put upon their own contract, by considering what they have done under and in pursuance of it, with a view to its settlement or fulfilment.

Considered in this view, do we find that the plaintiff, after having sold 15,000 bushels of rye for September delivery, made any preparation whatever, prior to September 8th, for the purchase of rye, either in the country or upon the board of trade? None whatever. But it is equally evident that when, on the eighth of September, rye had advanced to 80 cents, and the plaintiff made up his mind to protect himself, he furnished no money to his factor to purchase rye in store. But he instructed his agent to "cover rye," and do it "immediately." What did he mean by this? Could he have supposed for a single moment that this factor would, without any arrangement whatever, advance $12,000 to purchase rye for actual delivery? If it was his understanding of the contract that it called for actual delivery, why did he not, seeing that rye had advanced from $65\frac{1}{2}$ to 80 cents, and was still rising, remit money, or make some arrangement for money to purchase "immediately?" If he knew that it was the understanding of himself and his vendee that the contract should be settled upon differences, he might well ask his factor to advance the small sum required to pay differences. This would have been nothing extraordinary; and to my mind it is perfectly clear that when he said "cover rye," and do it "immediately," he meant that his factor should purchase rye on time for future delivery, to meet his own contracts for September delivery. Then one contract could be made to balance another by the mere payment of differences; and we shall presently see that the plaintiff's factor so understood him, and pro-

ceeded to make the purchase accordingly and settle the plaintiff's contracts upon the differences. In this way the plaintiff sought to protect himself against loss which might result from a still further advance in rye. We cannot for a moment suppose that the plaintiff meant to ask his factor to take $12,000 in cash out of his own pocket and purchase 15,000 bushels of rye in store for his protection. He clearly had in view a purchase by which his factor could settle the contracts to be "covered" by the mere payment of differences. No inference opposed to the view here taken by the court, as to the plaintiff's intention to settle his contracts by the mere payment of differences, can be justly drawn from the mere suggestion in his telegram of September 8th to the effect that his factor could possibly save money by "buying cash." Considering that the plaintiff was then already behind with his factor, and had failed even to furnish money to put-up margins, it would be preposterous to suppose that he meant to intimate that his factor should advance $12,000 cash to purchase rye on his account. What he doubtless meant was that money could be saved by purchasing rye for cash delivery instead of time delivery, in which case the differences would be payable in cash at the time of the purchase, instead of becoming payable at some future time in September. It was in this way, beyond question, that the plaintiff thought his factor could save money for him when he said, "I think if you would buy cash you save money."

Let us now turn our attention from the principal to the agent—from the plaintiff to Erick Gerstenberg, the factor, by whom the contracts were made and settled. The contracts were made in his name, not in the plaintiff's name. Was it Gerstenberg's understanding that it was the intention of the parties that there should be an actual delivery of the grain, or that it should be settled by the payment of differences at the option of the seller? Gerstenberg's testimony has been twice taken, and he has made the best case he could for the plaintiff. Nowhere do we find that the factor even notified the plaintiff to make consignments, or remit money to purchase in Chicago, or to prepare in any way to deliver the large amount of grain for which the factor was directly and personally responsible. Gerstenberg evidently understood that the contract was to be settled by the payment of differences, and that his responsibility extended no further than the sums which might be required for that purpose. In Gerstenberg's account with the plaintiff, which is exhibited, we find several entries for "differences" charged, paid, and credited. The telegrams tell the same tale. Gerstenberg in one dispatch informs the plaintiff

that he is "seven margins behind," and on the eighth of September, after Gerstenberg received orders to protect the plaintiff, to "send margins, sure." If Gerstenberg knew that the contract required actual delivery of grain, why did he not call for money to buy it? What good would mere margins have done for Gerstenberg's protection if he was compelled to make actual delivery? But, on the other hand, if it was Gerstenberg's understanding that the contracts were to be fulfilled by the payment of differences, it was very natural that he should call for margins from the plaintiff. Finally, how were the contracts in question adjusted by Gerstenberg? He had in July and August sold for September delivery, seller's option, 10,000 bushels of rye to the firm of A. M. Wright & Co., and 5,000 bushels to another party in his own name, but for the plaintiff's account. On the ninth of September, after this factor had received orders to "cover rye," etc., he purchased from A. M. Wright & Co. 15,000 bushels of rye at, I suppose, of course, the then prevailing rate of 85 cents. Gerstenberg was then, by the form of his contract, to deliver to Wright & Co. 10,000 bushels of rye at 65½ cents per bushel, and Wright & Co. were bound in terms to deliver to Gerstenberg 15,000 bushels at the price prevailing on the ninth of September; that is, 85 cents per bushel. But was any rye delivered or intended to be delivered by either party, or was it their understanding that their respective contracts should be settled and satisfied by the payment of differences? How can we judge of their intentions except by considering what they actually did in adjusting their contracts? Is it not just to conclude, in the absence of proof to the contrary, that parties to a contract adjusted according to their understanding of their own intentions in making it? There is no evidence that either Gerstenberg or Wright & Co. ever bought or owned a bushel of rye to deliver under their contracts. They settled by the payment of differences. It is perfectly evident that it was Gerstenberg's purpose, in the purchase of the 15,000 bushels from Wright & Co., to lay the foundation of a settlement in that way. Neither he nor Wright & Co. had evidently the least idea of investing money in these respective purchases for actual delivery. This is made further evident by the account which Gerstenberg gives of the remaining 5,000 bushels which he had sold in August to another party for September delivery, at 68½ cents, on the plaintiff's account. This, he tells us, was settled by a "ring," of which he gives the following account: The party to whom he had sold this 5,000 bushels had the same quantity and quality of grain sold to Lyon & Co.; Lyon & Co. had the same thing sold to Nichols

& Co., Nichols & Co. to Wright & Co., and Wright & Co. to Gersten-berg, as stated above. Instead of Wright & Co. delivering that rye to Gerstenberg, and Gerstenberg to the other people, and so on, so that eventually it would come back to Wright & Co., Gerstenberg sim-ply paid the difference in money value, and "that is what the trade terms a ring."

The reasonings of the supreme court of Illinois in *Lyon* v. *Culbert-son*, 83 Ill. 38, are applicable here:

"Had the agreement required the party, before he exercised the option, to have made an offer, or at least to have shown that he was able to fulfil his part of the agreement, and was willing to do so, then the contract would have con-formed to legal principles, etc.

    *       *       *       *       *       *       *       *       *

"It is true, the contract speaks of wheat in store, but neither warehouse receipts were offered, nor was it shown that the appellee had any wheat in Chicago, and it could not have been in the contemplation of the parties to deliver or receive it elsewhere, or it would have been so stated in the contract.

"The fact that no wheat was offered or demanded, shows, we think, that neither party expected to deliver any wheat, but in case of default in keeping margins good, or even at the time of delivery, they only expected to settle the contract on the basis of differences, without either party performing, or offer-ing to perform, his part of the agreement; and, if this was the agreement, it was only gaming on the price of wheat, etc.

"A contract to be thus settled is no more than a bet on the price of grain during or at the end of a limited period. If one party is not to deliver or the other to receive the grain, it is in all but name a gambling on the price of the commodity, and the change of names never changes the quality or nature of things. There is no evidence that the appellees had contracted for the wheat necessary to fill the contract, or had incurred the least expense towards the performance.

"The statute has prohibited, under heavy penalties, the sale of wheat on called options, to buy or sell grain, because of its pernicious tendency; but it seems to me that these contracts for the sale of grain, where neither party intends to perform them, but simply to cancel them before or at their maturity, and pay differences, are injurious to trade, and fully as immoral as are the sales of options.

"It is claimed that this wheat was again sold to ascertain the difference that should be paid. What wheat? it may be asked. There is no evidence that the appellees had any wheat that could be delivered at the place of the con-tract. So far as we can see the wheat only existed in imagination, and even this imaginary wheat may have been already sold a number of times before the imaginary fulfilment of the contract."

So, in the case at bar, there is no proof that the plaintiff or his agent, the factor, had in fact any rye to deliver, or any warehouse receipts representing rye in store. If this fact existed, it could easily

have been proved, and would doubtless have been established by some competent evidence. There is no evidence that Wright & Co. had a pound of rye in store with which to fill their contract for the sale of 15,000 bushels to the plaintiff's factor. Wright & Co., as far as it appears, relied for the fulfilment of the contract upon receiving 10,000 bushels of rye from Gerstenberg, and 5,000 bushels from other parties, who, as far as we know, had neither rye nor warehouse receipts to deliver. Why were not some of these parties called to show that they held rye or warehouse receipts ready for delivery in fulfilment of their contracts? The inference is that they had none, and that they all depended upon paying differences to adjust their contracts.

In my judgment it appears, by a decided preponderance of evidence, that it was not the intention of the parties to the contracts of July and August, 1880, that the rye should be delivered in fulfilment of said contracts, either by consigment or the transfer of warehouse receipts, but that said contracts should be adjusted and settled by the payment of differences. These contracts being, therefore, void, judgment must be given for the defendant.

### NOTE.

The question of the legality of sales by option, which is discussed with so much ability by Judge Love in the foregoing case, is dependent in part on local legislation, in part on judicial precedent, in part on the special tendency of the adjudicating court in respect to political economy. In the latter respect two conflicting tendencies exist:

1. That of *laissez faire*, accepted in the main by Adam Smith and by J. S Mill, and forming part of the political system of English liberals and of *doctrinaire* democrats in this country. Business should be left free, so it is argued, to adjust itself. For government to interfere in the making of contracts (unless for the single purpose of determining the proof on which they are to be sustained, as is the case with the statute of frauds) creates a greater evil than the evil it is intended to cure. This is eminently the case, so it is insisted, with "corners" and "options." If all "corners" are prohibited, either by legislation or by judicial decision, all retail business will be prohibited. There is no purchase for retailing into which the motive of "cornering" does not enter. I buy for the purpose of profit, and there is a tacit understanding between myself and other retailers that there shall be a sufficient advance charged to enable us all to make something by the transaction. In other words, we buy up all of a particular commodity, and we say to the consumer, "You shall not get this except on paying a higher price than we paid for it." Now this is "cornering" in so far as that by a tacit consent it precludes the consumer from obtaining the goods in question unless he pays a premium to

the retailer; and the manufacturer or wholesale dealer unites in this "cornering" by refusing to sell to the consumer unless on retail prices. The principle is the same as when particular parties unite to "engross" or absorb a particular staple by buying up the whole of it in the market and then holding it for a rise. This, which is "cornering" in the popular sense, no doubt may be used for extortionate purposes, yet it cannot be prohibited without at the same time prohibiting all retail trade. The evil cures itself far more effectually than it can be cured by the interference of the law. Supposing that a monoply is obtained by mere voluntary absorption of a particular article by which great gains are got, this leads only to the starting of competitors in the same line; and for the law to interfere and say "You shall not monopolize," is equivalent to saying, "You shall not trade." The same distinctions may be taken in respect to sales of things not at the time owned by the vendor. It is said that for me to agree to deliver next week at a fixed price a thing I do not now own, is gambling. It may be so; but, if it be, then gambling infects so large a part of every-day life, that if all that gambling thus infects be prohibited, business will be prohibited. My baker and butcher, for instance, engage to supply me with provisions each day for a month in advance, though these provisions are not now in their hands; and though they usually engage to supply at the market price, yet the cases are not rare in which (e. g., so much a pound for butter or so much for a loaf of bread) the prices are fixed in advance. All building contracts are based on this principle; the contractor makes or loses as the materials he uses fall or rise in the market, or the weather is unpropitious or propitious. If things are let alone, all this corrects itself. Men will make their contracts more special, so as to guard against disasters, or they will obtain insurances collaterally against loss; and, even if there are occasional disasters, it will be found that in the excitement of competition, and in the constant presence of risk, there is a stimulus, without which enterprise, caution, and sagacity could not be effectually called forth. That when things are let alone—in other words, when "trade" is "free"— things ultimately adjust themselves far better than could be done if the government interfered, is illustrated by the every-day operations by which a great city is fed. Here are 100,000 families, and each family has brought to its door the supply of milk, of bread, of meat, on which it relies. You station yourself—I borrow in this one of Archbishop Whateley's illustrations— on one of the avenues to a city as day is breaking, and you see approaching multitudinous wagons or boats laden with produce of all kinds. No law uttered by legislature or court prescribes to each producer or peddler what he shall bring to the city and what he shall sell; the only law is the social law of supply and demand; but this works so perfectly that the milk from a thousand dairies is collected to-night to be distributed early to-morrow morning precisely where it is needed in the city, and so with the vegetables from a thousand truck farms, and the meat from hundreds of slaughter-houses. If government, through either legislature or court, should interfere, this delicate adaptation of supply for demand would be destroyed. It is only by letting competition be unrestrained that supply is so adjusted to demand as to properly employ the producer and properly supply the consumer. It is only

under the incitement of competition thus induced that the staples of trade are from day to day extended and machinery made more perfect. Such is the *laissez faire* theory of political economy—a theory of late years, since the triumph of free-trade principles in England, adopted by the English courts as well as by the British parliament, and adopted also by the courts of several of our own states.

2. The conflicting school, to which I called attention, starts from an ethical or police basis. "Certain business contracts," it says, "are immoral, and must be prohibited;" and among immoral contracts are classed all contracts for the sale of things the vendor does not possess at the time, and which he does not expect to possess; the contract in such case only binding him to pay the difference in price in case the price of the article sold has risen at the time fixed, he being entitled to benefit by any fall of prices marked at the same period. This position is thus stated by Judge Love in the opinion above given. "If it be not the *bona fide* intention of the parties that the property shall be in fact delivered in fulfilment of the contract of sale, but that the seller may, at his election, deliver or not deliver, and pay differences, then the contract is void." In Illinois this is prescribed by a statute quoted by Judge Love, and though that statute is in terms so broad as to cover contracts which are not in any sense gambling, it is restricted by the state judiciary to cases where the transaction is to be "adjusted only upon differences." As going to the same point may be cited *Lyon* v. *Culbertson*, 83 Ill. 33, and other Illinois cases cited by me in the opening article in the Criminal Law Magazine for January, 1850.

As the contract before us was an Illinois contract, it was governed by Illinois law; and (supposing that the Illinois statute was not repugnant to the federal constitution) Judge Love had no alternative but to apply it as construed by the Illinois courts.[*] Whether such a statute conflicts with the clause in the federal constitution which provides that state laws impairing the validity of contracts shall be inoperative, is an important question which has not as yet been discussed; and it may be in view of this question that Judge Love, in the opinion before us, rests his conclusion, not merely on the statute, but upon the general policy of the law. And there is no question that, irrespective of statute, it is settled that a contract to pay any rise on the price of a particular article, at a given future period, is void under the common law as gambling. It is not a contract for sale and delivery, for no delivery is contemplated. It is simply a bet as to what the market will be at a particular time. "If prices are stationary there will be nothing to pay. If prices rise, I pay you the rise. If they fall, you must pay me the fall." Such a contract the courts will not enforce, as against the policy of the law. *Porter* v. *Viets*, 1 Biss. 177; *In re Green*, 7 Biss. 338; *Clark* v. *Foss*, Id. 540; *Rumsey* v. *Berry*, 65 Me. 570; *Noyes* v. *Spaulding*, 27 Vt. 420; *Sampson* v. *Shaw*, 101 Mass. 145; *Bigelow* v. *Benedict*, 70 N. Y. 202; *Story* v. *Salomon*, 71 N. Y. 420; *Harris* v. *Tumbridge*, 83 N. Y. 95; *Bruce's Appeal*, 55 Pa. St. 94; *Smith* v. *Bouvier*, 70 Pa. St. 325; *Moxten* v. *Gheen*, 75 Pa. St. 166;

[*]This statute is discussed by me in an article already referred to, published in the Criminal Law Magazine for January, 1882.

*Swartz's Appeal,* 3 Brewst. 131; *Fareira* v. *Gatell,* 89 Pa. St. 89; *North* v. *Phillips,* 89 Pa. St. 25; *Gheen* v. *Johnson,* 90 Pa. St. 38; *Ruchizky* v. *De Haven,* 97 Pa. St. 202; *Lyon* v. *Culbertson,* 83 Ill. 33; *Gregory* v. *Wendell,* 39 Mich. 337; *Barnard* v. *Backhaus,* 52 Wis. 593; S. C. 9 N. W. Rep. 595; *Sawyer* v. *Taggert,* 14 Bush, 727; *Wilheim* v. *Carr,* 80 N. C. 294. See, also, opinion of *Treat,* D. J., in *Third Nat. Bank* v. *Harrison,* 10 FED. REP. 248, citing opinion of *Thayer,* J., in the *Tinsley Case.*

Upon the whole question before us the following points may be regarded as settled:

1. Where the vendor contemplates *bona fide* delivery the contract is not vitiated by the fact that he does not have the goods on hand at the sale. *Hibblewhite* v. *McMorine,* 5 M. & W. 462; *Mortimer* v. *McMorine,* 6 M. & W. 58; *Hatch* v. *Douglas,* 48 Conn.—; *Stanton* v. *Small,* 3 Sandf. 230; *Morris* v. *Tumbridge,* 83 N. Y. 92; *Smith* v. *Bouvier,* 7 Pa. St. 325; *Brown* v. *Speyers,* 20 Grat. 296; *Cole* v. *Milmine,* 88 Ill. 349.

Nor is the contract vitiated by the fact that there is to be only a symbolical delivery, the thing to be delivered being at the time of delivery within the power of the vendor, so that if he choose he can obtain it and deliver it. *Ashton* v. *Dakin,* 4 H. & N. 867; *Cameron* v. *Durkheim,* 55 N. J. 425; *Sawyer* v. *Taggart,* 14 Bush, 727. See Biddle, Stockbrokers, 303.

In Pennsylvania, recent cases may be interpreted as holding that the fact that the party selling does not expect to have the thing sold in hand infects the transaction with the taint of gambling. See *North* v. *Phillips,* 89 Pa. St. 250; *Ruchizky* v. *De Haven,* 97 Pa. St. 202; *Dickson* v. *Thomas,* Id. 278.

But this, if such is the point actually ruled, is inconsistent with the rule established in England, and with that freedom as to contract which should be maintained unless as to contracts actually repugnant to settled policy. A party ought to be entitled to sell on expectancy.

2. The mere fact that an option is reserved does not vitiate. There are many circumstances under which an option is the only way in which can be consummated transactions beneficial to both sides. If all options were to be prohibited, all conditional contracts would have to be prohibited. See *Bigelow* v. *Benedict,* 70 N. Y. 202; *Kirkpatrick* v. *Bousell,* 53 N. Y. 318.

3. When no delivery, either actual or symbolical, is intended, but merely a a settlement of differences, the contract is void, and neither party can sustain on it a suit. *Grizeword* v. *Blane,* 11 C. B. 528; *Ex parte Marnham,* 2 De G., F. & J. 634; *Porter* v. *Viets,* 1 Biss. 177; Biddle, Stockbrokers, 33, and cases cited above.

It may be added that on the topic of Stockbroking two valuable treatises have been published in the last few weeks, the first in order of time being by Messrs. Arthur & George Biddle, of Philadelphia, (Lippincott & Co., 1882;) and the second that of Mr. J. R. Dos Passos, of New York, (Harper & Bro., 1882.)

To the first of these works several references have been already made. Mr. Dos Passos, on the topic before us, states the following conclusions:

"(1) Where a contract is made for the delivery or acceptance of securities at a future day at a price named, and neither party at the time of the making

of the contract intends to deliver or accept the shares, but merely to pay differences according to the rise or fall of the market, the contract is void, either by virtue of statute or as contrary to public policy.

" (2) That in each transaction the law looks primarily at the intention of the parties, which intention is a matter of fact for the jury to determine.

" (3) That the form of the transaction is not conclusive, and oral evidence may be given of the surrounding circumstances and condition of the parties to show their intention, and that a contract purporting on its face to be a contract of sale is a mere gambling device, although the contract is in writing under seal.

" (4) That option contracts—viz., 'puts,' 'calls,' and 'straddles'—are not *prima facie* gambling contracts.

" (5) To make a contract a gambling transaction both parties must concur in the illegal intent.

" (6) The defence of wager must be affirmatively pleaded, and the burden of proof is upon the party asserting the same.

" (7) In construing a contract, that construction is to be preferred which will support it, rather than one which will avoid it.

" (8) A maker who makes real contracts with third persons in behalf of his client, with the understanding between the client and maker that the former shall never be called upon to pay or receive more than differences, can recover the amount paid out for his client in the transactions, together with his commission.

" (9) A maker who advances money to his principal to pay losses incurred in a stock-wagering transaction can recover the same either on a note or otherwise.

" (10) A bill of exchange or promissory note given upon a stock-jobbing transaction is valid in the hands of a party who took it before it was due, for value, and without notice of the illegal consideration.

" (11) But such a bill is void in the hands of the original parties, or in the hands of a person who takes it after it is due or with notice of the facts."

Pages 477-8.

FRANCIS WHARTON.