## EDWARDS *v.* HOEFFINGHOFF.

*Circuit Court, S. D. Ohio, W. D.* March 20,'1889.)

1. **CONTRACTS—VALIDITY—DEALING IN FUTURES.**

   In relation to transactions in grain for future delivery, no matter what colorings or semblances of reality are thrown about the alleged purchase, if the jury can see that all these forms were mere shams, and that there was in fact no actual *bona fide* dealing in the article itself, but that the forms were adopted to evade the law, and as a cloak for gambling, it is their duty to tear away the disguise, and treat the transaction as it is.

2. **SAME—INTENTION TO GAMBLE—FACTORS AND BROKERS.**

   Though defendant may not have intended to make a *bona fide* purchase of grain, but only to bet on the rise or fall of the market, and to pay differences, still, if such intention were not known to plaintiff, the commission merchant on the board of trade who acted for defendant, and he executed the orders in good faith, and bound himself to receive and did receive and pay for the grain, and sold it at a loss under the rules, after due notice to defendant, and after defendant's repudiation or failure to comply with the contracts, plaintiff is entitled to recover his commissions and losses.

3. **ACCOUNT RENDERED—FAILURE TO OBJECT.**

   When an account current is rendered, and not objected to within a reasonable time, it has the force of an account stated. But this rule does not apply if, when the account was rendered, the parties had already come to a disagreement, so that assent from silence could not reasonably be inferred.

At Law. Action to recover money on contract.

*L. H. Bisbee* and *Paxton & Warrington,* for plaintiff.

*Lincoln, Stephens & Lincoln,* for defendant.

SAGE, J., (*orally charging jury.*) The plaintiff sues to recover from the defendant $15,667.14, with interest from July 6, 1887. The petition sets forth three distinct causes of action. The general allegations applicable

to all these causes are that at the dates stated in the petition the plaintiff was a grain commission merchant at the city of Chicago, doing business upon the floor of the board of trade of that city, and according to and subject to its rules, and that the defendant authorized and directed him as such commission merchant to make the purchases set forth in the petition, and to advance money thereon; the defendant agreeing to pay the plaintiff a commission of one-quarter of a cent per bushel on purchases, and a like commission on sales; also other customary rates and charges, together with interest on all moneys advanced by the plaintiff on account of said purchases. The petition also sets forth certain of the rules of the board of trade, with reference to the conduct of the business between the parties upon a purchase or sale, and providing for the selling of the grain bought upon the default of the person who ordered it to keep up what is called his "margins." The purchases set forth in the first cause of action are 100,000 bushels of corn, bought upon three orders,—April 6, 1887, 15,000 bushels; April 7, 1887, 75,000 bushels; and April 9th, 10,000 bushels; the total price being $42,218.75; and all the corn being of the grade known as No. 2, merchantable corn, for delivery at Chicago, at the pleasure of the seller, in the month of July, 1887. The plaintiff alleges that it was a condition of the purchase agreed upon between the plaintiff and the defendant that the defendant should from time to time, and whenever necessary, pay to the plaintiff such sums of money as might be required to protect and hold the plaintiff harmless against loss on account of such purchases, including the sum necessary to pay for the grain at the time of its delivery. That it is a general custom in the Chicago market in respect to all such grain transactions that principals should keep their commission merchants secured in the same way that commission merchants are secured under the rules of said board of trade, liable upon purchases made in behalf of their principals; of all which the plaintiff alleges that the defendant had full knowledge at the times when the purchases aforesaid were made. That on and after June 1, 1887, the market price of corn declined, and plaintiff, as frequently as the declines occurred, demanded payment from the defendant for protection against loss, but the defendant made default, (excepting that he did pay the sum of $2,000,) and on the 1st of July, 1887, said corn was delivered to the plaintiff, and he was compelled to and did pay for the same the contract price aforesaid, of all which the defendant had due knowledge; and the defendant, though requested, failed and refused to accept and pay for said corn, and on the 6th of July, 1887, the plaintiff, after notice to the defendant, sold such corn for account of and at the risk of the defendant on the board of trade of Chicago for $35,125. That the plaintiff paid on account of insurance and storage the sums stated in the petition. That there is due to plaintiff from the defendant on this cause of action $5,857.42, with interest at 6 per cent. from July 6, 1887. The second cause of action sets forth the purchase in May, 1887, upon the same conditions as those stated in the first cause of action, of 50,000 bushels of wheat for July delivery, at a cost of $43,412.50. This cause of action contains like averments of

the decline in prices, of calls upon the defendant to pay sums of money necessary to protect the plaintiff against loss, and the defendant's default, and that the wheat was delivered on the 1st of July to the plaintiff; that he was then compelled to and did pay for and received the same, and that, after due notice to the defendant, he did, on the 6th day of July, sell this wheat for the sum of $34,750; that he incurred also expenses for insurance, storage, and interest, and that he is entitled to commissions, making altogether,—that is, taking into account the loss on the wheat and the other charges to which I have just referred,—as the amount due from the defendant, $9,103.47, with interest from July 6, 1887. The third cause of action sets forth the purchase by the plaintiff, upon the request and at the direction of the defendant, in May, 1887, of 50,000 bushels of September corn,—that is, corn for delivery in the month of September, 1887,—at a cost of $21,593.75; that there was a decline in prices, repeated defaults on the part of the defendant to furnish the money necessary to protect the plaintiff; and that finally, on the 6th of July, 1887, after due notice, this grain was sold,—that is to say, the contract for the purchase of the same, because the corn was not then deliverable,—and realized the sum of $18,512.50; and that for the commission on the purchase and sale of this corn plaintiff is entitled to recover $125. The defendant is credited with $2,500 paid on account of that corn, leaving a balance of $706.25 due from the defendant to the plaintiff, with interest from the 6th of July, 1887. These three items make up the sum total which was stated at the outset, of $15,667.14.

The defendant, by his answer, denies each and every allegation of the plaintiff's petition, and sets up affirmatively that he had several transactions in the spring of 1887, made in Cincinnati, and to be there adjusted with M. S. Forbus & Co. only,—a firm doing business in Cincinnati, Ohio,—by way of dealing in futures in grain, and to speculate upon the rise and fall of prices therein, with no delivery of said grain, but one party to pay the other the difference between the contract price and the market price of the said grain at the time fixed for the execution of said pretended contracts. The said transactions were mere wagers and speculations upon the rise and fall of the market; were illegal and void. He denies all indebtedness of any and every kind to the plaintiff, and alleges that he is not indebted in any sum whatever to the plaintiff, and asks to be discharged with costs. The reply is a general denial of the matter set forth in the answer.

Something has been said on both sides with reference to what is called the burden of proof in this case. The party upon whom the burden of proof devolves in a civil case is required to make out his case by a fair preponderance of the evidence, and by a fair preponderance is not meant the larger number of witnesses, but the greater weight of testimony, judged by the impression which it makes upon the jury, and from the manner of the witnesses, the circumstances attending the transactions, and the character of the testimony itself. Now, in this case, the plaintiff alleges that he made actual purchases of the grain referred to.

The defendant denies that. It therefore devolves upon the plaintiff to satisfy the jury by a preponderance of the testimony or evidence that he did actually make the purchases and sales claimed, and that he suffered the loss which he claims. The defendant, having denied all the allegations of the petition, goes on to state affirmatively, not only that his transactions were exclusively with Forbus & Co. of Cincinnati, and to be adjusted there, but that they were not real or *bona fide* transactions at all; that they were nothing more than wager contracts having the form and semblance of reality, but being in fact nothing more than bets upon the prices of the market. That is an affirmative defense, gentlemen, and the burden of making that out devolves upon the defendant, not only for the reason that I have stated, but for another reason: that the presumption of law is in favor of the validity of contracts, and not in favor of their invalidity, and therefore he who sets up the invalidity is bound to prove it.

Now, with reference to what is gambling in grain and what is legitimate dealing, I will say, first, generally, that the simplest and clearest case of buying is that which occurs when a man buys for his own use in his family, or, if he is a farmer, for feeding his stock. Of course there can be no possible question about the validity of such purchases. Then come purchases for manufacture, as by a miller; or for resale, as by a dealer. Those, too, go unquestioned. Now, there is another class of purchases, actual purchases, neither for use nor for manufacture, nor are they for resale in the ordinary course of business, but exclusively for speculation; that is to say, the purchaser does not buy because he is in need of the corn, or because he intends to receive and keep it, for he has no need of it, and he has no such intention, but he buys simply and only that he may reap a profit out of the transaction. Now, gentlemen, if that be a real purchase,—an actual buying,—it is quite as legitimate in the eye of the law as a purchase for actual use. The dealer who buys to sell again buys that he may sell at a profit. The speculator buys that he may sell again, risking upon his hopes of an advance in prices. Now, these are the three kinds of purchases which the law sanctions, and which are perfectly legitimate. When it comes to a purchase upon speculation, it is of no sort of consequence in determining upon the validity of the transaction whether the purchase be large or small; whether the speculator be keeping within moderate bounds or whether he is running wild, actuated by his hopes and fancies. Now, for instance, suppose that a man having money and credit barely sufficient to enable him to buy 1,000 barrels of pork makes the purchase. He immediately hypothecates that 1,000 barrels of pork for enough money to buy 950 barrels more, hypothecates that 950 for enough money to buy 900 more, and so continues down to 500, and then on down, hypothecating that 500 so as to buy 475, and so on down; you will find by counting up that that man, having an actual capacity to buy 1,000 barrels of pork, has, by contrivances which are perfectly legitimate, bought and secured the payment of 13,000 barrels of pork, and if pork advances $1 per barrel he makes a profit of $13,000; if it advances $4 per barrel he makes a profit

of $52,000; if it declines $1 per barrel he loses $13,000, and may be utterly ruined. Now, while this may be reckless, and while it may be, in a certain moral view, just as bad as gambling, it is not so regarded in the law. The test, the great test, and the conclusive test, by which to determine legally whether a transaction in grain is legitimate or whether it is a gambling transaction is whether it is an actual dealing in the article itself; whether the contract to sell and deliver is entered into with the understanding that it shall be binding according to its terms. If it is, the transaction is legal; it is not subject to the condemnation of the law. It may be foolish, it may be reckless, it may be ruinous; nevertheless the law does not assume such a guardianship over men in the conduct of their affairs as to fix its condemnation upon such a proceeding as that. If, instead of hypothecating and pledging the purchase over and over again to make the grand total of 13,000 barrels of pork to which I have referred, the purchaser had chosen to put up what is called a "margin,"—that is, a percentage of the entire price,—and thereby secure the purchase upon the condition that if the price declined he would add to his margin so as to keep the difference between the price and the deposit always the same, there would be no difference in principle; and the law says that the mere fact that the purchase is made upon a margin does not invalidate it. The test still remains, was it a real purchase? Nor does the law set its condemnation upon a purchase for future delivery. That is just as valid as the sale or purchase of an article in hand, provided it be a *bona fide* contract of purchase and sale. Every farmer's wife who makes a contract to furnish butter at so much a pound the year round by the week deals in futures. Nobody ever thought of challenging such a transaction as being illegal, and so it is with the purchase of any commodity. If it be a *bona fide* purchase, it is of no sort of consequence whether it is a purchase of the cash article,—that is to say, of the article in hand,—or whether it is a purchase for future delivery; and the purchase for future delivery may be of an article not yet in being. Any of you gentlemen who are farmers could make a valid contract tomorrow for the sale and delivery of your next season's crop of corn which you have not yet planted.

But now we come to the other side. No matter what the form of the contract, no matter how many colorings of reality and of genuine dealing are thrown about the transaction, if, piercing all these disguises, the court or the jury see that these forms are mere shams, and that there was in fact no actual dealing in the article itself, but that the forms were adopted as a mere semblance to deceive and to evade the law, it is the duty of the court and the jury to tear away the disguise, and treat the transaction as it is. And, looking at it in that light, if they find that there is nothing genuine or real about it, the whole thing descends from the plane of legitimate dealing to the mere condition of gambling, and falls under the condemnation of law, and there can be no recovery upon it. To invalidate the transaction, however, it is not sufficient to show that either party to the contract intended that it should be merely a gambling transaction. Every contract has two parties at least, and, if it be said

that the contract was illegal because of the unlawful intent, the law requires proof that that intent existed in the minds of both parties to the contract. It will not do for one party—the purchaser, for instance—to say, when the price goes against him: "I never intended to take this grain. I never intended to deal in the article itself. This was nothing but a bet, and a wager, and I am not bound by it,"—because that is of no consequence to the other party, provided the other party entered into the contract in good faith, and actually sold the grain, and had it ready to deliver to him, and incurred in good faith the responsibility on his part of the contract. And consequently the law says that it must appear that the unlawful intent was mutual, and not merely on the part of one of the parties only to the contract. Now, the evidence on this point need not be direct. The law in reference to this point is that—as it is where fraud is alleged—circumstantial evidence may be adduced,— that is to say, the light which is thrown upon the case by circumstances can be looked to in exploring the case for its facts; and sometimes in cases of fraud, sometimes in cases of the character of the case now before the court, the main body of the evidence is circumstantial. And yet it must be evidence bearing upon the question, and legitimately bearing upon it. Consequently, when it was attempted to prove in this case what was done on the board of trade of Chicago between the parties other than the parties here before this court, the court ruled it out, because what other parties may have done does not even tend to prove in the slightest degree what these parties did. But, on the other hand, the court let in the testimony of the entire series of transactions between these parties, of which those in controversy in this case formed a part, so that the jury might explore the transactions between these parties so as to judge them altogether, and determine whether the transactions here were genuine or whether they were fictitious.

You have also had the testimony of witnesses. Two witnesses—the plaintiff and defendant—have each a very large interest in this case. It is the full amount in controversy, somewhere between fifteen and twenty thousand dollars, and in weighing the testimony of these two witnesses that circumstance is to be taken into account. Naturally, where a witness has an interest in the controversy, the inclination is to scan his testimony more carefully, and so it is in order to look to his manner on the witness stand, whether he is frank, open, and sincere, or whether he is guilty of evasion, or stumbles and shuffles, whether his story is probable, whether he is corroborated by other evidence in the case; and that is a very important consideration, gentlemen, because sometimes the only practical way to test the evidence of the witness is to compare it with the circumstances of the case, and, if you find it contradicted here and there and elsewhere, if you find it contradicted wherever it comes in contact with any other testimony, you feel inclined to place far less reliance upon his testimony. On the other hand, if you find him corroborated, not only by the probabilities, but by the other evidence in the case, you will give greater credence to his story. The documentary evidence also comes into play, and is to be taken into account, and the

testimony of the witnesses tried by that and by all the attending circumstances. You have the testimony of other witnesses who have, as they say, no interest in this case, and you have heard this evidence so fully commented upon by counsel that I do not deem it necessary to dwell upon it, nor to comment upon it. I leave it entirely to your decision, for you are the judges of the facts in this case, as the court is the judge of the law, and I have no disposition to trench upon your province. Then, were the purchases and sales executed by the plaintiff real or pretended? He produces the bought and sold notes, or the memoranda, made, as he testifies, at the time; he produces the warehouse receipts; he produces checks, given, as he says, in payment for the grain when bought in by himself; and produces the evidences of the transfer of the grain by him as set forth in his petition, receipts for insurance for the grain when in his care, receipts for storage, and the like. If you believe that testimony, gentlemen, necessarily you must come to the conclusion that these purchases and sales were actually made. The warehouse receipt is a document issued by warehousemen who have in store quantities of grain, and each one shows the receipt and holding of so much grain as it represents. By operation of law the transfer of that little piece of paper is a delivery of the grain it represents. There are in law two kinds of delivery. There is what is called "manual" or "actual" delivery,—as, when one of you sells a horse to another, and you hand him over, that is a case of manual delivery; when one of you rents a house to another and hands him the key, he thereby delivers the house, and that is a symbolical delivery. And so, if one of you had 10,000 bushels of corn or wheat in one of the elevators in this city, and should sell it to another, and hand over your warehouse receipt for that amount, it would be as complete a delivery of the grain as though it were placed actually in the manual possession of the purchaser. Therefore, if you find that purchases and deliveries were made by use of these warehouse receipts, and that they were genuine, you must find that there was an actual dealing in the grain itself.

The next point in the case was, what was the relation of the several parties to each other? There was Edwards, the plaintiff; Forbus, the broker; Englehorn, the solicitor; and Hoeffinghoff, the defendant. Edwards, according to the testimony, is a commission grain merchant at the city of Chicago, doing business upon the floor of the board of trade. A commission merchant is one who buys or sells goods or merchandise consigned or delivered to him by his principal for a compensation commonly called "commission." He differs from a broker in that he may buy and sell in his own name, and very frequently does, without disclosing the name of his principal, while the broker has no right to buy or sell, excepting in the name of his principal. The commission merchant is intrusted with the management and control or disposal of the goods to be bought or sold, and he has a special property in them, and a lien upon them for his charges, advances, and commission. The broker is one who negotiates the purchase or sale for the principal. He is not responsible for anything except bad faith. He has no control of the

property. The plaintiff, Mr. Edwards, according to the testimony, is a member of the board of trade in the city of Chicago, and, under its rules, bound to make good all his contracts upon penalty of expulsion in disgrace from the board of trade, the loss of its membership; so that he is by the rules made an insurer of the contracts which he makes. According to the testimony, the names of the principals are not disclosed. The dealings are altogether between the commission merchants upon the floor. Forbus, according to the testimony, has an office in the city of Cincinnati, and takes orders, to be executed either at Chicago, St. Louis, New York, Baltimore, or New Orleans, I believe, always acting for and in the name of his principal, and having only for his interest in the matter his share of the commissions. In reference to that I shall have something to say presently. Englehorn, according to the testimony, had been employed in an insurance office, but left that, at least in part, and connected himself with Mr. Forbus, having a desk in his office, and their relation, as I remember the testimony,—and you gentlemen may correct me if I am wrong,—was such that Forbus gave him a share of his own commission for any customers that he might bring in. I understood at first that he received one-half of Mr. Forbus' commission, but later in the testimony it developed more particularly that the division was made between the three; that is to say, the total commission, when the orders were executed by Mr. Edwards, was collected by Mr. Edwards. Forty per cent. was retained by him, 40 per cent. sent to Forbus, 20 per cent. went to Englehorn. Edwards testifies that he had no arrangement with Englehorn. The arrangement was with Forbus, and that arrangement was simply that Mr. Forbus was his correspondent, and Forbus received 60 per cent. of the commission and he 40 per cent., and then Forbus made the division with Englehorn. With him, Edwards, according to his own testimony, had nothing whatever to do, although he did, to accommodate Mr. Forbus, and at his request, open an account with him on his book. This is as nearly as I can state it. I do not pretend to be accurate. I only refer to facts to enable me to state what I have to say about the law. This arrangement for the division of commissions in that way, and the relation that existed between the parties, did not make them partners, nor did it make Forbus the agent of Edwards, nor did it make Englehorn the agent of Forbus. As to what took place you will have to determine upon the evidence. According to Mr. Englehorn, the defendant, Mr. Hoeffinghoff, gave orders, which he knew were to be executed at Chicago, for the purchase of grain. If I recollect Mr. Englehorn's deposition correctly, he states that Mr. Hoeffinghoff made some reference to gambling, and that he was under the impression that Mr. Englehorn regarded the transaction as a gambling transaction. Mr. Hoeffinghoff testifies that the whole transaction was gambling, as he understood it; that he had no knowledge that any orders were to be sent to Chicago; that it was all the time understood that he was simply to give these orders nominally, in form, but not in substance, to Mr. Forbus, and there was to be a settlement of differences according as the market might go, without any real dealing in grain;

that Mr. Englehorn stated to him that it was all "wind and paper;" that when he was introduced to Mr. Forbus, Mr. Forbus made the same statement; that he never knew there was to be any dealing in Chicago until long afterwards; that he did not receive accounts from Chicago; while, on the other hand, the testimony of Mr. Forbus, and that of Mr. Englehorn, is to the contrary. They testify that the orders were given to be executed at Chicago, and that they were *bona fide* orders. There is the testimony of other witnesses. This part of the case has been so thoroughly canvassed that I shall leave it to you to decide from the arguments you have heard. What I have to say to you is this: If it be true, as claimed by the defendant, that all the contracts he made were wagers upon prices, and were with Englehorn and Forbus, and were so understood by them, there is no case here against him. If, on the other hand, it be true, as claimed for the plaintiff, that the orders were given for the purchase of corn and of wheat, to be executed at Chicago through Mr. Forbus, then Mr. Forbus was the agent of Mr. Hoeffinghoff, and he is just as much bound by what Mr. Forbus did in giving orders to Mr. Edwards as though he had given them personally, because whatever a man does through an agent he does by and through himself.

Now, with relation to the offsets. You have heard the rule of the board of trade read, and therefore I need not read it again to you, providing that, where cross-trades exist between commission merchants under such circumstances that they can be canceled, that shall be done; one shall be offset against the other, and new contracts substituted. Such a rule, to be binding upon the customer, must be known to him, as I understand the decision of the supreme court of the United States. But if it is known to his broker it is the same thing as though known to him, because he makes his broker his agent, and the knowledge of the broker therefore is chargeable to him, and he is bound by it, so that if he made Mr. Forbus his agent, and Mr. Forbus, as he testifies, knew of this rule, Mr. Hoeffinghoff is bound by it.

Now, I do not remember, gentlemen, anything else on the general charge. I will now take up the special charges. I am asked to give you this, and I will do so: "The jury, in reaching the intention of the plaintiff in carrying on these transactions as he claims for the defendant, have the right to consider the character of the plaintiff's business as shown by his books, the amounts involved, and the closing out of other transactions with the defendant, as shown by the evidence and from all the attending circumstances surrounding the transaction; and if the jury are satisfied from all the evidence that the defendant did not expect to receive grain, nor the plaintiff or Forbus to deliver it, but only to make wagers upon the rise and fall of the market, and to settle by difference, then the plaintiff cannot recover." That I give to you, gentlemen, while at the same time I will say this to you: If the orders were *bona fide*, and were executed by actual purchase, the circumstance that the defendant afterwards and before the day of delivery sold out his contract does not affect the validity of the contract,—does not affect the validity of the transaction. Now, for instance, a man may go out

to one of these subdivisions around the city where there is a sale of lots. He may buy in a lot. The next day he may have an offer of $100 advance on his bid. Is there any doubt that he has the right to turn over that bid? Is there any doubt that a man has a right to sell out any contract that he has, if he make money by it? Not the slightest in the world. It all comes back to the old question, the original question, the controlling question, in this case, whether it was a genuine purchase. Now, suppose that a man has a contract—has given an order for the purchase of September wheat. He gives it in May, and at that time September wheat is quoted at 67 cents in the market, and along in June, or early in July, September wheat has gone up to 79 cents or 80 cents, and the holder of that order, exercising his best judgment, says: "I think that is a good price to sell at." He has a perfect right to sell out that contract. There is no gambling in that. That was a real purchase, and his selling out merely transfers that contract to somebody else; somebody else takes the contract, who is bound to take that wheat, and the contract is still alive; he merely steps out of it. So the fact that the contracts are closed out before they mature does not prove that they were invalid. At the same time you have a right to look to that,—to the circumstance, if existing, that there were no deliveries,—in connection with the other circumstances, to determine whether or not it was true that they were actually purchases and sales, or whether they were merely engagements made with a view to settlement and payment of the differences. "If the jury believe from the evidence that the purchases claimed to be such in the petition, if any were made, were made upon the order of Forbus by solicitation of Englehorn with Edwards' knowledge and consent, and that the three—Edwards, Forbus, and Englehorn—divided commissions on such trades,—Edwards and Forbus forty per cent. each, and Englehorn twenty per cent.,—then the said Englehorn was the agent of the plaintiff, and statements made by Englehorn as to the character of such trades when entered into will bind the plaintiff." But, gentlemen, if there was an agreement between Edwards and Forbus and Englehorn that they should act together, and divide the proceeds of this business, Forbus and Englehorn acting for Edwards, why then, of course, they would be his agents, and whatever was said to Englehorn would be said to Forbus, and would be said to Edwards. But, if Forbus as a broker and correspondent here, had nothing more than an arrangement for the division of commission with Edwards, then these results do not follow. It depends upon the fact whether there was an arrangement of agency between them. I am also asked to charge you that "the verdicts of juries in other cases cited and read by counsel have no place in the decision of this case. The facts of each case, and the law applicable thereto, must stand together,—and this case must be passed upon by the jury upon its own special facts, and the facts and circumstances surrounding it and in evidence, and the law applicable thereto." Gentlemen, I give you that; and I say to you that it would be altogether improper for you to pay any attention to anything that was read in your hearing out of the books in the course of the trial; and I

may go a little further and say that what was said by counsel to or at the jury in the course of the trial ought to pass in at one ear of the jury and out at the other,—I mean prior to the argument. Their time for talking to the jury is when they come to argue the case. Their time to say something is then, but not before. Before that it is always out of order, and the jury ought not to pay the slightest attention to it; neither ought they to allow it to prejudice the case of the client. Your province and the province of the court is to try this case upon the evidence and the law. We have no interest whatever in it excepting to do exactly what is right and fair and just and true between these parties. I have no doubt, gentlemen, that it will be your utmost effort to do that, so far as your part of the case is concerned.

Something was said during the progress of the testimony or argument with reference to an account current, and the force and effect of rendering it, and its reception in silence. I will give you this charge on this subject: An account current is an open or running account between two or more parties. When rendered, and not objected to within a reasonable time, it has the force of an account stated; that is to say, it will be taken as correct until shown by the parties to whom it was rendered to be incorrect. But this rule does not apply if, when the account was sent, the parties had already come to a disagreement, and therefore assent from silence could not reasonably be inferred. Now, there is testimony with reference to making an account, and with reference to the sending of the account by Mr. Edwards to Mr. Hoeffinghoff. If he sent it, and at that time there was no open, express disagreement between the parties, and Mr. Hoeffinghoff kept that account for two or three days,—for, when the facts are clear, what is a reasonable time is a matter of law for the court,—if he kept that account without expressing dissatisfaction, then it is fair to presume that the account is all right; that is to say, it will stand until it is shown by Mr. Hoeffinghoff to be wrong. On the other hand, if the account was furnished after the parties had fallen into disagreement, and after it was perfectly understood by Mr. Edwards that Mr. Hoeffinghoff did not intend to pay this money, the mere sending of the account sales to Mr. Hoeffinghoff would amount to nothing, because it is unreasonable to suppose that Mr. Edwards would be misled by it.

I will give you this charge: "If you find that the defendant authorized Englehorn to give orders to Forbus to buy the corn and wheat in question without designating the place at which, or a person of or through whom, the grain should be bought, and Forbus & Co. received the orders through Englehorn and transmitted them to the plaintiff at Chicago, to be executed on the board of trade of that city, then the plaintiff was authorized to execute them, and defendant is bound by his (plaintiff's) acts in purchasing said grain. If the jury find that the defendant authorized Englehorn to give orders to Forbus & Co., as brokers, to buy the corn and wheat in question at Chicago, either with or without designating the board of trade of that city as the place, or the plaintiff as the person, to execute the orders, and that Forbus & Co. received the orders,

and transmitted them to plaintiff, then the plaintiff was authorized to execute them. If you further find that either Englehorn or Forbus, or both, were, at the times the orders were sent, acquainted with the rules of the said board of trade, then defendant is, and was at such times, chargeable with knowledge of said rules, and bound by them." That is to say, if you find that they were acquainted with the rules, and that the defendant authorized them to transmit the orders to Chicago. I also give you the following charge requested by the plaintiff: "In determining whether or not the defendant authorized the wheat and corn in question to be bought, the jury may consider whether Englehorn acted under general authority given to him previous to the date of the order to buy the wheat, and also any testimony tending to show an adoption or ratification of the purchase. That is to say, the jury will consider the testimony of the witnesses in this behalf, the course of dealings which had occurred another month, orders for the purchase of grain for defendant, the giving of orders by Englehorn and Forbus & Co. to buy grain for defendant, and the latter's knowledge and acquaintance in respect thereto, the defendant's subsequent knowledge of the particular order, and failure to pay therefor to Mr. Forbus, and the admissions, if any, which defendant made as to his liability for the corn, and if the order of purchase was within Englehorn's special or general authority, or was subsequently ratified by defendant, it is equally binding upon him." Gentlemen, that has relation, I suppose, particularly to the purchase of 50,000 bushels of wheat which Mr. Hoeffinghoff claims he did not order,—did not direct the purchase of; and the counsel for Mr. Hoeffinghoff say that Mr. Englehorn admits that that order was executed without any direct authority at the time from Mr. Hoeffinghoff. Now, if that was so, and Mr. Englehorn had a general authority which could give him the right to make such order without a special order, then Mr. Hoeffinghoff would be bound. If he had no such general authority, and Mr. Hoeffinghoff afterwards, being advised, knowing what had been done, assented to the purchase made in his name, that would be a ratification, and would bind him just as much as if he had given authority for that transaction. But the ratification must be with full knowledge of the facts, and that is another matter which I leave entirely with you upon the evidence.

I also give you this charge asked by the plaintiff: "In determining whether the defendant knew that the orders to purchase the grain in question were executed in Chicago on the board of trade, subject to the rules of that board, and through the plaintiff, the jury will consider the defendant's previous transactions in grain, and his opportunities to learn where and through whom they were conducted; also such statements of accounts as you may find the defendant received, either directly or indirectly, from the plaintiff,—that is, either from the plaintiff or through Forbus. If he retained these statements without objection within a reasonable time within which he should have returned the same, and made known his objections thereto, that is to be considered as evidence tending to show that he was advised thereof, and con-

sented thereto, or acquiesced in the same. If you find that a person of ordinary knowledge and intelligence would have competent knowledge of the facts shown herein, then the defendant would be deemed to have known the same." I have given that to you probably in substance in the general charge. If the jury should find that the defendant did not intend either to receive or pay the price for any of the grain in question, and intended only to bet on the rise and fall of the market,—to pay differences,—still, if such intention was not known to the plaintiff, and he executed the orders in good faith, and bound himself to receive, and did receive and pay for, the grain, and thereafter sold the same, after reasonable effort to notify defendant of the delivery and intended sale thereof, and after defendant's repudiation of, or failure to comply with, the contracts, then plaintiff is entitled to your verdict.

The next I have already given. There are one or two others here, but I understand I have already given them, and I do not care about reading them.

*Judge Bisbee.* The commissions, instead of being a quarter of a cent for the purchase, and quarter of a cent for the sale, were only a quarter of a cent for the purchase and sale.

*The Court.* I think you have it the other way in the petition. (To the jury:) Gentlemen, I need scarcely say to you that your determination of this case should be upon the evidence and upon the evidence alone. Whatever feeling of sympathy on the one hand, or of prejudice on the other, either court or jury may be inclined to, should be put entirely aside. It is nothing but a cool, clear-cut question of fact and of law, and you and the court are alike under oath to so decide the case, without reference to any other consideration from any source whatever.

I will say this in reference to the books: These books contain the accounts of other transactions, and now, being in the custody of the court for the time being, they will be committed to your charge. The entries in these books are confidential, and the court is bound to respect them as such, and so you will be; that is to say, whatever you find there relating to transactions not involved in this case, is to be held as though you had never found it.

### EXCEPTIONS.

*Mr. Stephens.* The court told the jury that if Edwards made the contracts in July, substantially, that we were bound by that.

*The Court.* I did not intend to say that.

*Mr. Lincoln.* Another matter was, you say "that if the contracts were not made." I think the jury may misunderstand that. Suppose the parties did enter into contracts, and intended to fulfill them as they entered into them, but that the agreement was that no grain was to be delivered, then it would be gambling; but your honor put it in such a way that the jury may have a feeling that there must be no contracts made for it, whereas, if they were made, as Hoeffinghoff claims, without delivery of grain, then legally they were not made.

*The Court.* I tried to make that just as clear and strong as words could

make it. If the form was a mere concealing, and there was no substance to it, the jury had a right to tear away the disguise, and find what the contract was.

*Mr. Lincoln.* The .court said in so many words that Forbus was a broker. We claim that, although he was a broker, he could make this contract with .Hoeffinghoff as a principal.

*The Court.* My recollection of what I said is that Mr. Forbus, according to the testimony, was a broker. I then explained the difference between a broker and a commission merchant, and I said afterwards that, if the arrangement was between Hoeffinghoff and Englehorn and Forbus alone, there could not be any recovery in this case.

*Mr. Lincoln.* You said also, if I remember it correctly, that Forbus was a mere broker, and had nothing to do with buying and selling. Now, although Forbus is in his profession a broker, there is no reason why he may not have made this contract with Hoeffinghoff, and they should have the thing settled here with Forbus. That's what I thought was likely to be misconceived.

*Mr. Stephens.* I don't know whether you intended to tell the jury that these books and the other accounts in them as to the method in which Mr. Edwards did his business was for them to consider or not. You said that you had ruled out of the evidence for certain reasons what others did, and I did not know whether you meant by that what others did with Edwards, or what others did on the board of trade.

*The Court.* The only thing was as to this cash wheat and .cash corn, and that the jury might go through the books and see if there were any entries to show cash wheat, and see if that was exceptional.

*Mr. Stephens.* To the charge concerning the general transactions of Edwards with other people, where there are these things on his books, we want to take an exception; and also as to the special charges given for plaintiff; and we also want to take an exception to each modification of each of our special charges, and also want to take an exception to each special charge refused. In your charge, referring to the plaintiff, you said: "He produces the bought and sold notes, he produces checks given in payment for grain, and produces evidence of transfers of grain and insurance receipts, receipts for storage, etc. If you believe that testimony .you must believe those purchases actually made." I do not know these are the exact words, but it is to that sentence I desire to take an exception.

*Mr. Warrington.* Did your honor understand that those three charges that I asked the first day, and you refused, were excepted to?

*The Court.* The first two were refused at the time, and the exception goes in at that time, and the last was covered by what is in the general charge.

*Mr. Stephens.* I want to take an exception to all those matters relating to the agency of Mr. Forbus for us, and all matters relating to what was said by Forbus, and as to his knowledge as a broker, and what relates to our being bound by these rules of the board of trade and giving these orders, and matters of this kind in the general charge, and I think we

ought to be permitted to make such exceptions to the charge as we can indicate more definitely when the charge is written out.

*The Court.* You can do that.

The jury, which had retired before the exceptions were stated, were then recalled and further charged as follows:

"Gentlemen, the charge I gave you was altogether oral, excepting the statement of the case, and some matters that I meant to refer to I omitted, or at least there seem to have been some things that were not exactly understood. One is, that it must have been intended when the contracts were made that there should be a *bona fide* purchase and delivery of the grain. If Mr. Edwards made the contract without then intending to buy or deliver the grain, and afterwards, when Hoeffinghoff began to sheer off, went in and bought the grain, so as to make a show of fulfilling the contract, that would not do. You must be satisfied that the intention was to fulfill the contract at the time the contract was made. I thought I stated as much in the charge. If I did not, I state it now. If the form of the contract was for the purchase and delivery, but the understanding was that there was to be no delivery, the understanding controls over the form. That I thought I said also. I stated to you that, according to the testimony, Mr. Forbus was a mere broker. So he was. But it does not follow from that that he had not the capacity to make the contract as principal himself with Hoeffinghoff; and, as I told you in another part of the charge, if you find that that was the real transaction,—that is to say, that Hoeffinghoff had no transaction with Forbus excepting as a principal, as set up in his answer,—then the plaintiff has no case. As to the books which you have, or will have, the court permitted an inspection of the books—other accounts in the books—upon certain matters. You will remember that the corn or the wheat which were closed out in July, that there is an entry in that long book—cash-book or whatever it was—of cash corn, cash wheat, cash grain; and Mr. Stephens insisted that those were the only entries of cash grain in the book within those months. Now, the whole range of those books is open to your inspection on that point. What I meant to say was that general transactions between Mr. Edwards and other parties cut no figure in this case, and I only permitted an examination of those entries to aid you in determining whether there was anything exceptional or illegal in selling that wheat for cash, or whether the fact that no other entry of the sort appears in the books, if that be the fact, tends to show that Mr. Edwards was not conducting a legitimate business.

"There are a good many matters in testimony to which I have not referred. I intended to turn the testimony over to you. I did not intend to express any opinion whatever about the facts. I did not want the jury to think the court was one side or the other, because the court is not on any side, and so I did not refer to the testimony given by Mr. Hoeffinghoff, relating to the settlement which he claims he made when he gave his note,—in June, I think it was,—and said that that should be

the end of it, or words to that effect. It is claimed that that was the settlement and closing up of the transaction. That depends altogether upon the testimony and what you find from the witnesses, and, of course, if he settled then, that is the end of it."

*Mr. Lincoln.* As I understand the charge of the court, the jury might have got an impression that if Mr. Edwards did in fact buy in Chicago this grain, that that bound the defendant. The charge of the court seemed to be based upon the theory that if they find that Edwards did in fact buy the grain in Chicago that then we were bound for it, and I don't think the court intended that.

*The Court.* I do not think counsel understood the charge as well as the jury. I did not intend to convey that impression. I have all the time referred to the contract between the parties, and the contract between parties is when the minds meet. That, in a written contract, is when they sign the papers; in an oral contract, when they come to an understanding. It is the understanding when the contract is made that governs. If the understanding then was that there should be an actual purchase, and an actual delivery and receipt of the grain, the contract is binding, notwithstanding they may have subsequently concluded to sell out, or even to settle differences. If the contract was a *bona fide* one for the actual purchase and sale, it was good. If it was not good when it was made it could not be made good by subsequent purchase; that is to say, Mr. Edwards could not be permitted to tack and change his course and get into shape to claim to be in the position of a *bona fide* purchaser of grain unless you are satisfied that that was the agreement at the time the contract was made.

*Mr. Lincoln.* My point was simply, the mere fact that Mr. Edwards did buy it up there did not bind us.

*The Court.* I have tried to say that. I do not see how I could make it any more clear.