PHILO B. MILES AND CHARLES C. MILES

v.

ROBERT B. ANDREWS AND WELLS ANDREWS.

*Negotiable Instruments — Notes — Consideration —Transactions upon Board of Trade—Options—Evidence—Instructions—Gaming.*

1.  An unlawful consideration is neither good nor valuable in law.

2.  The buying and selling of options in grain, it being understood and intended that neither the buyer nor seller is to receive or deliver the grain so bought or sold, and that the loss or gain resulting shall be settled by the payment or receipt of the difference between the prices agreed upon and the market value of the same at the time appointed for delivery, constitute gaming transactions.

3.  Where such purchases and sales are made through commission merchants upon the Board of Trade, in conformity with orders of a broker, the purpose or understanding of the former and of the parties of whom they buy and to whom they sell, is immaterial in an action brought by such broker to recover upon notes given by one of his patrons covering such transactions.

4.  That orders were in form for the actual purchase and sale of wheat for future delivery, is a circumstance of little weight as evidence of intention, and the actual delivery under one order, will not be conclusive of an intention to receive it, when the order for purchase was given .

5.  Where notes were given to cover losses on several deals, in one of

which the grain was delivered, the consideration being entire, the illegality of any part will taint the whole.

6. The statement of the defendant in an action on such notes, that he signed them, expecting to pay them if the balance was against him when they matured, can not avail the plaintiff in such action.

7. Where parties honestly intend an actual purchase of property for future delivery, the purchaser may lawfully sell out his bargain before the time appointed for delivery, and such a purchase for speculation is as valid as for any other purpose.

8. The character of such deals depends upon the intention or understanding of the parties thereto, to be determined by the jury from the evidence.

9. In an action brought to recover upon promissory notes, the defendants contending that they were without good and valuable consideration, but were given for money won by the plaintiffs from one of the defendants in speculating in the market price of grain, this court holds that evidence touching a certain telephonic message between two of the parties hereto was properly admitted, likewise statements made by a person named, touching the character of the transactions, and by an agent of the plaintiffs at the time of the procurement of the execution of the notes in suit, and declines to interfere with the judgment for the defendants.

[Opinion filed June 12, 1891.]

APPEAL from the Circuit Court of Tazewell County; the Hon. N. W. GREEN, Judge, presiding.

Messrs. W. DON MAUS and JACK & TICHENOR, for appellants.

The circumstances relied upon to prove the illegality of this contract are consistent with the claim that it was a legitimate business transaction. It is probably true that dealings on margins, as it is called, are fraught with much evil. But it is an evil that existing laws do not reach. No case has been cited which declares such a contract illegal. If we should so hold, it would be difficult, if not impossible, to draw the line between legal and illegal transactions. Hatch v. Douglass. 48 Conn. 116, 128; Rumsey v. Berry, 65 Me. 570; Edwards v. Hoeffinghoff, 38 Fed. Rep. 635.

The testimony of plaintiffs seems to be conclusive, in that they affirmatively show every element of good faith in all their dealings with the defendants. They had no interest in the transaction except to place the contracts for the defendants. They had no interest in the gains or losses, and neither did their commission agents. The contracts were actually

placed by Milmine, Bodman & Co. for a commission paid to them. It was immaterial to them whether defendants made money or lost, as their commissions were not affected by loss or gain. Plaintiffs had no interest in the transaction whatever, and did not want to carry the transactions, and so advised R. B. Andrews. They did not even approve of his speculating on the Board of Trade. It was, as they say, only on account of the fact that defendants were old friends, and had been doing business with them for a long while, that they placed the contracts. Is there a single syllable of testimony, on either side, that the notes were given for money won by the plaintiffs from the defendants in speculating on the market price of grain, that it was understood by both parties that no grain should be delivered, and that the loss or gain should be settled by the payment of the differences between the purchase price and the market price at the time appointed for the delivery, and that the notes were given in consideration of such losses by defendants, and gains by the plaintiffs, as is alleged in defendants' only plea? In what one of the several transactions is it shown that plaintiffs gained one penny? Or where does it appear that defendants lost one penny which the plaintiffs received, or could have received? There must be two parties to a gambling contract, and what the purpose of the one may be is of no consequence unless the other had notice of such purpose. "It can not be a wager unless parties are cognizant of the facts." Hibblewhite v. McMorine, 5 Mees. & W. 462. And when it appears that a broker has advanced money for his principal at his request, it will never be *inferred* that the agent knew his principal intended to make illegal use of it. The cases all hold the gambler to strong affirmative proof that his broker had knowledge of his illegal intent. Pixley v. Boynton, 79 Ill. 351; Benson v. Morgan, 26 Ill. App. 22; Rumsey v. Berry, 65 Me. 570; Roundtree v. Smith, 108 U. S. 269; Irwin v. Milliar, 110 U. S. 499; Bartlett v. Smith, 4 McCrary, 388; Bangs v. Hornick, 30 Fed. Rep. 97; Clark v. Foss, 7 Biss. 540; Clay v. Allen, 63 Miss. 426; Lehman v. Strasburger, 2 Woods, 554; Gregory v. Wendell, 40 Mich. 432; Wall v. Schneider, 59 Wis. 352; Murry v. Ochiltree, 59 Ia. 435.

There is no proof in the record tending to show that a single one of these transactions was a gambling transaction, or one upon which the actual grain was not only deliverable, but delivered, if not to Andrews, to the party to whom he sold it. Andrews does not pretend to say that the contracts to purchase were optional, but that the buyer had the option or right to sell his contract before the grain was delivered or deliverable. In his judgment the contracts were binding on him; and if he held until the month arrived, he would assuredly be compelled to receive the grain; and he invariably, with one or two exceptions, acted upon this assumption, and sold his grain before it was deliverable. This was a right he had, and of which the plaintiffs had no control whatever. All they did was to place his contract as a personal favor, but taking it in their own name as customary with brokers. Gregory v. Wendell, 40 Mich. 432. But they invariably refused to interfere with this contract thereafter, until directed by Andrews. In the absence of proof of some kind, that it was mutually understood between the parties that the delivery should be prevented by the sale of the property before it was deliverable, there is not an element of gambling or other illegality in any of these transactions.

But the evidence does not, in any event, tend to sustain the plea. No settlement was made on the basis of differences in contract price and market price when delivery could be required, as stated in the plea, and this is not the defendant's idea of his option, which was to sell again, before delivery The defendants, having withdrawn their general issue and assumed the affirmative upon a special plea, should be required to present a defense in accordance with their plea.

"Sales for future delivery have long been regarded and held to be indispensable in modern commerce, and as long as they continue to be held valid, one who buys for future delivery has as much right to sell as any other person, and there can not, in the very nature of things, be any valid reason why one who buys for future delivery may not resolve, before making the purchase, that he will resell before the day of delivery, and especially when, by the rules of trade, the per-

son to whom he sells will be bound to receive the goods from
the original seller and pay him the contract price.   The objec-
tion to commercial gambling is, that men enter into fictitious
contracts, never intended to be performed by themselves or
any one else, and so affect prices and trade without having
any legitimate connection in fact with either." Sawyer v.
Taggart, 14 Bush. 727.

Messrs. B. S. Prettyman, J. V. Graff and T. N. Green,
for appellees.

Evidence of prior conversation is admissible to prove an
oral contract to be a gambling contract.   Wilson v. Root, 119
Ill. 159, 379; Brand v. Henderson, 107 Ill. 145; Hewitt v.
Dement, 57 Ill. 507.

It is true, the plaintiffs say they bought all the wheat for
account of both of the defendants, but this both of the defend-
ants positively deny, and if they bought all the wheat after
the first option of May, 1886, for both defendants, why was it
that all of their reports, and all of their accounts of all these
options were made out to, and in the name of, Robert B.
Andrews, and all sent to him, and none of them made out
against, or sent to, Robert B. and Wells Andrews, or to Wells
Andrews alone?

These facts and evidence of the defendants fully warranted
the jury in finding, in effect, that plaintiffs' statements in evi-
dence, that they bought these option deals for both of the
defendants, and got orders from Wells Andrews for the dis-
posal of some of them, and which was utterly denied by him,
was not true.

There can be no question but that the notes were given
for this difference between the losses and profits in these Chi-
cago option deals, between the plaintiffs and Robert B.
Andrews, and if these deals were illegal then there was no
consideration for the notes sued on, for an illegal consideration
is no consideration.   In re John Green, 7 Bissell, 338.

" If any part of the consideration of a note is illegal, the
whole note is void."   Henderson v. Palmer, 71 Ill. 579.

If either plaintiff partner knew the options were illegal, or

understood it to be a gambling transaction, then both are liable to such illegal act.   Tenney v. Foote, 95 Ill. 108.

Plaintiffs admit in argument that there is no proof here that these purchases were in fact ever filled; no proof that the party to whom Andrews sold the grain ever received it.

Why were not Milmine and Bodman called to prove it, or a warehouse receipt for the grain in store for delivery or receipted as delivered ?   Their absence from the proof has no tendency to show an actual or a legal transaction between plaintiffs and Robert B. Andrews.   In Pixley v. Boynton, 79 Ill. 351, and other Illinois cases cited by appellants, in each case the facts found were that one of the parties to the contract had no illegal intention, or that they were *bona fide* purchasers by evidence, in fact, found by the jury in the cases "proven by a preponderance of evidence."   The rules and principles decided in those cases do not conflict with the evidence and the instructions of the court given in this ' case relying on the statute.   Rev. Statutes of Ill., S. & C., 791, Sec. 178, 179.   We cite in support thereof the following cases : Pickering v. Cease 79 Ill. 328; Schneider v. Turner, 130 Ill. 36; Samuels v. Oliver,130 Ill. 76; Lyon v. Culbertson, 83 Ill. 33; Kreigh v. Sherman, 105 Ill. 51; Brand v. Henderson, 107 Ill. 142; Pearce v. Foote, 113 Ill. 228; Cothran v. Ellis, 125 Ill. 501; Tenney v. Foote, 95 Ill. 108; Webster v. Sturges, 7 Ill. App. 560; Beveridge v. Hewitt, 8 Ill. App. 467; C. N. Bank v. Spaids, 8 Ill. App. 549; Doxey v. Spaids, 8 Ill. App. 549; Griswold v. Gregg, 24 Ill. App. 387; Carrol v. Holmes, 24 Ill. App. 453–460; N. Y. C. G. Ex. v. Mellen, 27 Ill. App. 556.

PLEASANTS, J.   This was an action of assumpsit on three promissory notes for $1,000 each, made by appellees to appellants, two of which bore date of October 18, 1886, and were payable respectively in one and two years, and the third of June 20, 1887, at one year, all bearing interest at eight per cent.

The declaration was in three special counts upon said notes respectively, and the trial was had on issues joined upon two special pleas, viz. : First, that said notes were given without

any good and valuable consideration whatever; and second, that they were given only "for money won by the plaintiffs from the defendant Robert B. Andrews, in speculating on the market price of grain, to wit, by buying and selling deals and options in grain; that in each and all of said deals and options it was understood and intended by both the plaintiffs and the defendant Robert B. Andrews, that neither party was to receive or deliver the grain so bought or sold, and that the loss or gain resulting from such transactions should be settled by the payment or receipt of the difference between the prices agreed upon and the market value of the same at the time appointed for the delivery thereof," and that the defendant Wells Andrews, signed them as surety only. Verdict for defendants; motion for a new trial overruled, and judgment entered.   A reversal is here urged upon the grounds that the court admitted improper evidence and gave improper instructions for the defendants, and that the proof did not fairly support the verdict.

Robert B. Andrews had been buying and shipping grain at Washington, in Tazewell county, for a number of years, when the transactions here in question commenced. Wells Andrews was his father, carrying on the business of milling at the same place, but not in connection with the son. Appellants had long been commission merchants and grain dealers at Peoria. They had been doing business with and for Robert B. Andrews for ten years, buying grain of him and selling for him. Their father and his father had formerly been partners at Washington, and the relations of their families had always been very intimate.

The transactions in question were a series of purchases and sales on the Board of Trade of Chicago, of wheat for future delivery, made by Milmine, Bodman & Co., members of the board, for account of appellants, who, however, acted therein as brokers for, and at the request of Robert B. Andrews. They were begun in December, 1885, and continued until August, 1888, and consisted of about a dozen purchases and as many sales. The first, in December, 1885, was of 5,000 bushels, to be delivered in May following, and the next in Feb-

ruary, 1886, was for the same amount and delivery; each of the others was for 10,000 bushels. In every instance the direction or order given to appellants and by them to Milmine, Bodman & Co., was in form for the purchase of the quantity and for the delivery stated, unconditionally. It is claimed that the 10,000 bushels so ordered to be delivered in May, 1887, were actually delivered to Milmine, Bodman & Co. In all the other cases the purchase was transferred by sale, also through them, of the same amount, for the same delivery, before the time appointed for its delivery. Reports of these transactions, purchases and sales, with the resulting profits or losses, as they are claimed to have occurred, were promptly made by Milmine, Bodman & Co. to appellants and by them to appellee R. B. Andrews, to which he made no objection at the time.

It appears that the two notes of October, 1886, though sent to Andrews to be signed about the time they were dated, were held by him until December, when John Wren, a brother-in-law of Philo B. Miles, residing in Washington, at his request called on appellees and obtained their signature to, and delivery of them. They were given solely for losses on these deals paid by appellants for R. B. Andrews. Appellees both admit that with full knowledge of their actual consideration, they signed all the notes sued on in good faith. While they were in bank at Peoria, R. B. Andrews made two payments of interest on them, and says he frequently promised to pay them, and failed to do so only from want of ability.

But being sued upon them, appellees defended on the alleged ground that this actual consideration was, in the eye of the law, neither good nor valuable; that the losses so paid for R. B. Andrews were incurred on deals that were on his part gambling transactions; that he did not intend by any of them to receive or deliver wheat according to the form of the order given for purchase or sale, but to forestall such receipt or delivery by him or for his account, by formal counter sales and purchases, and pay or receive, as the case might be, the difference between the buying and selling prices; and that appellants well knew, at the time, that such was his intention.

As has been seen, the second special plea averred that the parties intended that neither was to receive or deliver the grain so bought or sold, and that as between them the deals should be settled by the payment or receipt by Andrews of the difference between the purchase price of the grain and its market value "at the time appointed for the delivery thereof." In point of fact, not one of them was settled upon that difference. Excepting the wheat bought for May, 1887, which is claimed to have been actually delivered to Milmine, Bodman & Co. for appellants, the counter sale was in each case made before the time so appointed, and the difference received or paid by appellants for Andrews, was that between the purchase price and the market value at the time of such counter sale. It is therefore said that as to the basis of settlement, these facts tend to prove an understanding variant from that which is averred, and do not support the plea.

We think the substance of the averment is that the settlements were to be made without delivery of the grain, upon the difference between the prices at which it was nominally bought and sold, and that it was immaterial whether the counter sale was made at or before the time appointed for delivery; in other words, that these were not intended or understood to be actual dealings in grain, but bets upon the chances of rise and fall of prices in the interval between the time of the nominal purchase and the time appointed for delivery on such purchase.

But if under this plea, appellees were required to prove the difference intended, strictly according to the letter of the averment, the evidence was admissible under the other, that the notes were given without any good or valuable consideration. That was a good plea.    Honeyman v. Jarvis, 64 Ill. 366.

An unlawful consideration is neither good nor valuable in law.    If these were gambling transactions on the part of Andrews and appellants knew it, the consideration was unlawful; and they were such if he intended not to have the grain received or delivered to him, but to settle with appellants on the differences as stated.    The purpose or understanding of Milmine, Bodman & Co., and of the parties of whom they

bought or to whom they sold, is immaterial in this case. McCormick v. Nicholls, 19 Ill. App. 337; Coffman v. Young, 20 Ill. App. 82; Beveridge v. Hewitt, 9 Ill. App. 482–3. The question here is between appellants and appellees. They might have used innocent agents in transactions that as between themselves were gambling. That the orders were in form for the actual purchase and sale of wheat for future delivery, is a circumstance of little, if any, weight as evidence of their intention; for the same form is used alike for legitimate and illegitimate dealings, when the intention is to deliver and receive the grain, as when it is to settle on differences. Colderwood v. McCrea, 11 Ill. App. 545; Beveridge v Hewitt, 8 Ill. App. 476–7; Tenney v. Foote, 4 Ill. App. 599. Even the fact of actual delivery under one of these orders, would not be conclusive evidence, as between these parties, of their intention to receive it when the order for purchase was given. In Beveridge v. Hewitt, 8 Ill. App. 478, the court say in speaking of Tenney v. Foote : " All of these contracts, with one exception, were settled by the parties thereto before the time of delivery therein provided for, by the receipt and payment of differences in prices, the property embraced in one of said contracts being actually delivered to and received by Hooker & Co.," the commission men on the Board of Trade. So here it is said the wheat for May, 1887, was actually delivered to Milmine, Bodman & Co. Andrews testified that all he knew of it was the report made to him by appellants, and why it was not resold like the rest, before the time appointed for delivery, if it was not, he does not remember. He may have been unable to furnish the required margin or difference, or surprised by the delivery so early in the month as the third and fourth days, on which it is said to have been made. But whatever the reason, if he did not intend to receive it when he gave the order to purchase, it was a gambling transaction on his part. Moreover, since the consideration of the notes was entire, being for the balance of losses on that and other deals, the illegality of any part would taint the whole. Tenney v. Foote, *supra;* Chap. 38, Sec. 131, R. S., 1887.

Much stress is laid upon the statement by each of the appellees that he signed the notes in good faith, expecting to pay, if the balance should appear to be against R. B. Andrews when they matured, and the fact that he paid some interest on them and repeatedly promised to pay the principal. But gamblers generally promise in good faith to pay, and actually do pay, if they lose; for otherwise there would be no gambling. And yet they are apt to contest suits brought to enforce payment.

Then, notwithstanding the form of the orders and of the contracts made on the Board of Trade in pursuance of them, the delivery of the grain in one instance, the innocence of Milmine, Bodman & Co. throughout (if they were innocent), and the signing of the notes in good faith by appellees, the real character of these deals as between the parties to this suit was still an open question. The cases above cited and many others hold that it depended altogether upon their intention or understanding in regard to them, and further, that their intention or understanding was to be determined by the jury "from all the circumstances of the case, as disclosed by the evidence." Beveridge v. Hewitt, 8 Ill. App. 479.

The evidence discloses a number of circumstances tending to show an understanding on both sides that they were dealing in prohibited options. Andrews swears they so understood. It is substantially conceded that on his part these deals were pure speculations; and the question is whether he was speculating in actual grain, or directly and only in its prices.

Clearly he wanted none of it for his own consumption, nor to handle in business by actual receipt and delivery. He resided at a long distance from Chicago, and had no store, office, agent or correspondent there. He dealt in grain legitimately, only in a small way, from hand to mouth, at Washington, and shipped what he bought, not to Chicago, but to appellants at Peoria. He could get the wheat at Chicago only by paying the price in full on delivery, and had not means enough to pay for half the quantity ordered. All this the appellants well knew. Why, then, should they suppose he

intended, or expected to receive it, when his object as a speculator could be as fully accomplished by settling on the difference, without the inconvenience of handling it, with nothing to pay if he gained and only a small percentage of the price if he lost?

Andrews further testified that he had dealt through appellants in options in 1881 or 1882; that the series of transactions here in question commenced in December, 1885, by his telephoning them to buy for him " 5,000 option deal of wheat for May option," and afterward an " additional 5,000 bushels May option;" that late in April, Philo called him up and said, " May is coming along and I don't want this wheat delivered to me;" and he answered, " I don't either," whereupon it was sold at a large loss.   From this it would seem that Philo had understood he was not to receive it, and was fearing that Andrews, through forgetfulness, inattention, lack of means to pay the difference, or other reason, might allow delivery to be made and appellants to be charged with the full amount of the price.   If they should sell without authority from Andrews, they could not recover the loss for that reason, independent of the character of the deal, and might well expect he would make that defense; while if they should have his direction to sell, he would regard it as a debt of honor and pay it.

Appellees and John Andrews speak of several occasions on which expressions were used to and by appellants and their agent, Wren, which are claimed to have indicated that they all understood these transactions as gambling deals in options.   It is unnecessary here, to refer to any of them more particularly, except the two following :

Appellee Wells Andrews was the first witness called for defendants, and said: " Prior to signing of these notes my son had asked me to sign them.   My son and I then went to the telephone office together, and then Robert went to the telephone and called for P. B. & C. C. Miles, and they rang; and he says, 'Philo is this you?'   Did not hear the answer.   Then Robert said ' I have been down to see Uncle Johnny to go on the note, and he says he had got sick and

tired of gambling in these options, and would not go on the note, but father would; and he then turned around and said, "Philo says it is all right.'" The witness did not hear any answer, nor know that Robert was talking to Philo, if to anybody. Objection to this testimony was overruled, and exception taken.

Robert B. Andrews stated that before signing the note he had a talk with plaintiffs over the telephone; that Philo Miles called him up and said he was behind on that option deal and wanted him to send over some money; that he told him he had none to send; that Philo then said, if his father and Uncle Johnny would go on it, they would carry the deal; that he answered he would see them. The witness then proceeded: "I went and saw Uncle Johnny and told him what I wanted, and he said he was tired of this gambling business in Chicago and would not have any more of it; he would not go on the note. (This being objected to, defendants' counsel said they would make it competent, and the objection being thereupon overruled, the witness continued.) Then I went and saw father and he said he would go on with me. I then went to the telephone, called Philo up and told him what Uncle Johnny said, and as he said it, and what father said. Philo said that would be all right."

Counsel still insist that the statement of Wells Andrews was inadmissible; first, because he did not know that the communication was addressed to Philo or received by him; and second, because what Uncle Johnny said was mere hearsay and matter of opinion. We think that upon the testimony of Robert that the conversation was in fact with Philo, the statement of Wells of matter of fact within his knowledge, being corroborative of that of Robert, so far as it went, was competent also; and that the statement of Uncle Johnny, whether of fact or opinion, was competent because it was communicated to the plaintiffs, and related to the character of these transactions. It informed them of his understanding and declaration of that character, a declaration not idly made to a third person, but deliberately, to one of the parties, and as the reason for refusing an important request urged by him

at the instance of the other. As bearing upon the question of plaintiffs' knowledge that Robert was gambling, we think it was competent. Of its weight the jury were the judges.

It appears that on the same day the counter sale of the May wheat was made, 10,000 bushels were purchased for June delivery, which were sold May 29th, also at a loss, and on that day 10,000 were bought for July, which were sold in June, and so on, a fresh purchase being made on the same day the last preceding was sold. When the October notes sued on were sent to Andrews to be signed, he had furnished only a few hundred dollars for margins and was in arrears to appellants on these deals for nearly, if not quite, their full amount, and another deal was pending. He delayed the signing in the hope that wheat would advance and the balance against him be materially reduced. On the account for grain shipped appellants were owing him about $400. He wanted that balance, and had drawn upon them for it; but they were not willing to honor the draft until he secured them for their advances on these deals. Matters thus stood between them in December, when appellants sent Wren to see him and urge the signing and return of these notes.

On the trial appellees were asked to state what Wren said to them about it. The answer of Wells Andrews was: " He and my son were talking together. He says, 'Bob, you had better sign those notes; it is the best thing you can do; the prospect is very flattering; I am a great bull on wheat. Before the deal will come around I shouldn't be surprised if it would go out of sight.'" We then went into the office and I asked him, " How do the boys feel about this wheat?" His answer was that they were bullish on wheat, or firm, or something of that kind. After the notes were signed he said: "Bob, I will see that that draft is all right." Robert did not undertake to give his language, but it was the same in substance.

·This was all objected to—the statement about the draft, because made after the notes were. signed and the rest for alleged want of authority in Wren to represent appellants' views of the prospects of wheat.

It does not appear that Wren's authority in the premises, as to the means of accomplishing the end of his agency, was prescribed or limited, except that, as appellant C. C. Miles testified, he was expressly authorized to say to Robert Andrews that they would honor the draft if he would send them those notes. This answers the objection to that statement and also tends to show that the agency was not merely ministerial, to receive and transmit the notes. It was to persuade a reluctant debtor to sign the notes and get his father to sign also as surety. On that ground we think that what he said by way of inducement was admissible. Appellants having obtained the notes by means of what he so said, are bound by it.

The foregoing are the only instances of alleged error in admitting evidence.

In the Beveridge case, *supra*, speaking of the intention of the parties as shown by the circumstances, the court said: "But perhaps the most significant proof on this subject is to be derived from the manner in which the business itself was conducted. Forty-four different purchases were made and also the same number of sales, yet no property was in fact delivered or offered to be delivered. Instead of this every deal was closed out long before the period of delivery arrived, by a counter purchase or sale;" and that the inevitable conclusion is that there was no *bona fide* intention or expectation by either party to deliver or receive the commodities purchased or sold, but that under the guise of transactions, legal in form, they were really dealing in options, to be ultimately settled on the basis of the differences in price. Beveridge v. Hewitt, 8 Ill. App. 481–2. To the same effect is Colderwood v. McCrea, 11 Ill. App. 546 *et seq.* In those cases the plaintiffs were regular merchants on the Board of Trade. The orders to them and their purchases and sales for the defendants were in form absolute, for the commodity mentioned, and their accounts were promptly so rendered, and accepted without objection. For aught that appears the other parties on the board of whom they purchased or to whom they sold may have honestly intended actual receipt or

delivery and so been entitled to recover as against them, for the property may have been actually delivered to the party ultimately entitled to it according to the form of the transaction. But as between them and the defendants the court held the fact that these numerous deals were uniformly closed out by counter sale or purchase before the time for delivery and the transaction settled by charging or crediting the difference, to be significant evidence of their mutual intention to gamble in prices. And so here.

It is not doubted that where the parties honestly intend an actual purchase of property for future delivery, the purchaser may lawfully sell out his bargain before the time appointed for delivery, nor that such a purchase for speculation is as valid as for any other purpose. It may be true, also, that a counter sale before the time for delivery, in a single instance, or irregularly in a number of instances, might be little or no evidence of an original intention to deal in differences, or if any, it might be overcome by other circumstances. But where the original intention is the matter in question, the fact that such counter sale was uniformly and regularly made in a continuous series of deals, composing so many as were here shown, will and must be regarded as tending to prove a purpose not to receive or deliver the property, but to settle on the basis of differences in its price. Nor do we understand the cases of Sawyer v. Taggart, 14 Bush. 727; Gregory v. Wendell, 40 Mich. 433; Edwards v. Hoeffinghoff, 38 Fed. Rep. 635, or any others cited, as holding otherwise on this point. Here that fact was aided by evidence of former dealings between Robert B. Andrews and appellants (Colderwood v. McCrea, *supra*), of the pecuniary condition of Andrews (Beveridge v. Hewitt, *supra*), who began this business without any other security to appellants. These, and some others above mentioned, were doubtless understood by the jury as the surrounding "circumstances" referred to in the ninth instruction given for the defendants, and to which we see no substantial objection. From these others they may have found that appellants understood, or ought to have understood, when the first order was given, that Andrews did not really want nor

intend to receive at Chicago in the following May the 5,000 bushels then in form ordered, and that they did in fact so understand, seems not a strained inference from such a conversation as was said to have been held by telephone in April. The evidence of his real intention accumulated with every successive deal, and if they knew it when they advanced any part of what was included in these notes or either of them, then such notes were void.   Chap. 38, Sec. 131, R. S.

An elaborate argument is made against the first instruction given for the defendants, by which the jury were told that "an illegal optional contract is one that may be settled without actual delivery and payment for the grain purchased, by adjusting the differences between the contract price and the market price at the date of delivery, as the party having the option may elect, in lieu of the actual delivery of and payment for it at the price at which it was purchased.   It is a mode adopted for speculating in differences in market values, of grain or other commodity, and such contracts or options are void."   It is said that if this properly defines an illegal contract for future delivery, then "every unexecuted contract of purchase for future delivery is illegal;" that "power to make a contract involves power to unmake it, to cancel it, to compromise it, to arbitrate it and to settle it by the payment of damage without compelling the parties to go to law about it;" that "every *valid* time contract for the delivery of grain *may be* settled by the payment of differences, if the parties (so) elect."

The passages thus quoted present the substance of the argument, and many, more or less like them, are found in a number of cases cited.

But what is meant on the Board of Trade by the *settlement of a contract?*   Certainly it may happen in the case of a real purchase for future delivery that either of the parties may be unable, or for some reason come to be unwilling to perform it, and they may lawfully settle on the basis of the difference between the contract price and the market value at the time of settlement; for, the contract being valid in its inception, does not cease to be so by such inability or unwillingness to

perform it, and the difference is the measure of damages which the law fixes for its breach. This, however, would not be a settlement of the contract, but of the claim and right to compensation for its breach. Where a contract is understood by the parties alike, it is "settled" only by its performance according to that understanding. In common speech, to settle a contract is to agree on its provisions and terms. On the Board of Trade it seems to be used in reference to contracts of purchase or sale for future delivery which may be complied with, according to the understanding of the parties, by the payment of differences, and they are there said to be "settled" when so complied with. In such cases there is no breach, no damage, no compensation, no substitution by a new agreement of an equivalent, for performance. There is done just what was understood the contract itself required in the event that has occurred. And that understanding, whether expressed in the contract or not, is just what makes it a gambling transaction. It is not an actual purchase or sale of anything, but a bet on the fluctuations of its market price—an illegal "option" contract.

In Pearce v. Foote, 113 Ill. 234, the Supreme Court say: "As was said by this court in Pixley v. Boynton, 79 Ill. 351, the true idea of an option is what are called, in the peculiar language of the dealers, 'puts' and 'calls.' A 'put' is defined to be the 'privilege of delivering or not delivering' the thing sold, and a call is defined to be the 'privilege of calling for or not calling for' the thing bought. 'Optional contracts,' in this sense, are usually settled by adjusting market values, as the party having the 'option' may elect. It is simply a mode adopted for speculating in differences in market values of grain or other commodities. It must have been in this sense the term option is used in the statute."

We think the instruction complained of, in its obvious meaning, fairly accords with the idea here expressed, and correctly defines an illegal optional contract. It clearly means a contract which itself provides, as understood and intended by the parties, that it may be performed or complied with by adjusting differences in lieu of delivery and

payment of the price. In aid of that definition it uses the very language of the Supreme Court, characterizing it as " a mode adopted for speculating in differences in market values," and thus excludes all contracts that are valid. No juror would be misled by it.

The second instruction for defendants is also complained of as failing to require proof that plaintiffs participated in or had knowledge of the unlawful intention of Andrews to gamble in prices, if such was shown to have been his intention, in order to justify a verdict for the defendants. The objection is based on the closing paragraph of the instruction, which is, that "if from all the evidence in this case the jury believe the defendant Robert B. Andrews purchased options from or through the plaintiffs, in grain, in violation of this law, as explained in these instructions, and the notes in question were made to cover losses he so sustained to plaintiffs in settling such losses, the plaintiffs can not recover thereon in this action."

This is preceded by a recital in substance of the statutory provisions declaring void all notes, etc., the consideration of which in whole or in part is money won by gambling, and imposing a fine for contracting to have or give an illegal option, and declaring all contracts made in violation of this statute gambling contracts, and therefore void. The paragraph quoted is but an application of this law, which as so recited clearly implies a common intention of the contracting parties. And if a question would be at all likely to arise in any mind, whether Andrews could purchase illegal options "from or through the plaintiffs" without their knowing them to be illegal, we think it would be settled for this case beyond all doubt by the explanation in " these instructions" (not this and the next preceding instruction), which, alike on the part of plaintiffs and defendants, set forth the necessity of this participation or knowledge on the part of plaintiffs in order to defeat this action so frequently, clearly and emphatically that it could not be overlooked or misunderstood. Eleven were given on each side; those given for plaintiffs, the third, fourth, fifth, seventh, eighth and eleventh, were addressed specifically

to this point, and the legal proposition was stated in each as plainly as it well could be, and the attention of the jury called to the issue of fact, to which it applied. And of those given for defendants it was also directly or incidentally and plainly stated or recognized in the third, fourth, fifth, seventh, eighth, ninth and eleventh.

We have thus considered all the points suggested for appellant, and perceiving no substantial error in the record, the judgment will be affirmed.

*Judgment affirmed.*