## DAVID DOWS, JR. & CO. *vs.* SAMUEL L. GLASPEL.

Opinion filed August 3rd, 1894.

### Gambling in Wheat—Commissions and Advances—Recovery by Agents.

Evidence examined and *held* to support finding that plaintiffs knew that defendant's purpose was to gamble in wheat, and that they acted as his agents in furtherance of such purpose. In such a case the agent cannot recover his commissions or the advances made by him on behalf of his principal. Whether, in making purchases or sales, the agent in such a case enters into legal contracts is immaterial. If he does, he exceeds his power, and cannot recover his advances. If he does not, if the other party to the purchase or sale merely intends to gamble as well as the agent's principal, then the transaction is illegal on both sides, and the agent who brought it about cannot recover his advances or his commissions. The agent in such a case cannot recover if he brings about a sale which on one side is untainted with the gambling intent, for such a deal he had no power to make; and he cannot recover when he loses money in bringing about a deal which is illegal on both sides.

### Money Advanced as Margins Cannot be Recovered Back.

Defendant sought to recover as a counterclaim moneys he had paid plaintiffs as margins in these gambling transactions. *Held*, that he could not recover at common law, and that, although the liability of plaintiffs to refund such moneys was governed by the statute of Minnesota, where all the transactions were held, yet that that statute was not broad enough to permit a recovery.

### Evidence Competent for Single Purpose—Presumption.

When evidence which is competent to establish a fact is admitted, the court on appeal will not assume that the trial court considered the evidence in finding another fact which it was not legally competent to prove, when the latter fact is fully supported by other evidence.

### Costs to Defendant.

Unless the plaintiff is entitled to costs, the defendant recovers costs as a matter of course in the District Court. Nor is his right affected by the fact that he set up a counterclaim which he failed to sustain.

Appeal from District Court, Stutsman County; *Rose*, J.

Action by David Dows, Jr., and George B. Cooksey, copartners as David Dows, Jr., & Co., against Samuel L. Glaspel, to recover commissions and advances made by plaintiffs on account of the sale and purchase of wheat by them as defendant's agents, in which defendant set up a counterclaim. From a judgment for defendant in the main case, and against defendant on his counterclaim, and also disallowing costs to defendant, both parties appeal.

Modified as to costs, and affirmed.

*Ball & Watson,* and *White & Hewitt,* for appellant.

Speculation is a litigimate branch of the commerce of today and speculations in options and futures is legal excepting in the few states where it is prohibited by statute. *Smith* v. *Bonvier,* 70 Pa. St. 325; *Kirkpatrick* v. *Bonsall,* 72 Pa. St. 155; *State* v. *Miltenberger,* 13 Mo. App. 503; *Hatch* v. *Douglas,* 48 Conn. 116; *Clark* v. *Foss,* 7 Biss. 540. An option contract is one in which there is merely an option given as to the day within a given month, upon which delivery may be made or required. Dewey on Contracts for Future Delivery, 26; Ray on Contractual Limitations, 45. When the contract is bona fide in its inception and contemplates an actual delivery, the manner of its subsequent settlement whether by the payment of differences or otherwise cannot invalidate it. *Melchert* v. *W. U. Tel. Co.,* 11 Fed. Rep. 193; *Williams* v. *Tiedman,* 6 Mo. App. 269; *Sawyer* v. *Taggart,* 14 Bush. 727. Brokers on the Board of Trade acting as agents for customers have an implied authority to follow the rules and usages of the board. Dewey 147; Ray 47; *Horton* v. *Morgan,* 19 N. Y. 170, 75 Am. Dec. 311 and note; *Kingsbury* v. *Kirwin,* 77 N. Y. 612; *Rosenstock* v. *Tormey,* 3 Am. Rep. 125; *Bibb* v. *Allen,* 149 U. S. 481; 23 Am. and Eng. Enc. Law, 733, note 1.

The burden rests upon the defendant to show the alleged illegal character of the transaction. *Bigelow* v. *Benedict,* 70 U. S. 202; *Story* v. *Solomon,* 71 U. S. 420; *Irwin* v. *Williar,* 110 U. S. 499; *Ramsey* v. *Berry,* 65 Me. 570; *Whitesides* v. *Hunt,* 97 Ind 191. The defendant must show that the intention to gamble in prices was mutual. Dewey 50; *Edwards* v. *Hoffinghoff,* 38 Fed. Rep. 644; *Pixley* v. *Boynton,* 79 Ill. 351; *Murray* v. *Ocheltree,* 13 N. W. Rep. 411; *Connor* v. *Robertson,* 55 Am. Rep. 525; *Union Bank* v. *Carr,* 15 Fed. Rep. 438. That the defendant intended to resell before the delivery of the wheat to him is not evidence of intent to wager. *Sawyer* v. *Taggart,* 14 Bush. 727. *Gregory* v. *Wendell,* 39 Mich. 337. The plaintiffs are entitled to recover, even though the transactions were wagers since they were mere agents or

bankers of the defendant. They are not *in pari delicto.* *Conner* v. *Robertson,* 55 Am. Rep. 527; *Wilkinson* v. *Tousley,* 16 Minn. 299; *Lehman* v. *Strassberger,* 2 Woods 554; *Durant* v. *Barthe,* 98 Mass. 168; *Planters Bank* v. *Union Bank,* 16 Wall. 500; *Warren* v. *Hewitt,* 45 Ga. 501; *Clark* v. *Foss,* 7 Biss. 540. Where the courts hold wagering contracts invalid, they refuse to assist a party seeking to recover money already paid on such wager. *Kahn* v. *Walton,* 20 N. E. Rep. 210; *Higgins* v. *McCrea,* 116 U. S. 671; *White* v. *Barber,* 123 U. S. 392.

*Edward W. Camp* and *S. L. Glaspel,* for respondent.

To uphold a written contract for the sale and delivery of grain at a future day, for a price certain, it must affirmatively appear that it was made with an actual view to the delivery and receipt of the grain and not as a cover for a gambling transaction. *Barnard* v. *Backhaus,* 52 Wis. 593. Contracts made in pursuance of the customs of the Board of Trade are from the known character of the latter presumptively without bona fide intention. *Beveridge* v. *Hewitt,* 8 Bradw. 483. "Dealing in futures" has acquired the signification of a mere speculation upon chances. *Fortenburg* v. *State,* 1 S. W. Rep. 58; *Tantum* v. *Arnold,* 6 At. Rep. 316; *Mutual Life Ins. Co.* v. *Watson,* 30 Fed. Rep. 653; *Cobb* v. *Prell,* 15 Fed. Rep. 774; *Sprague* v. *Warren,* 41 N. W. Rep. 1113; *Melchert* v. *Am. U. Tel. Co.,* 11 Fed. Rep. 193; *Edwards* v. *Hoffinghoff,* 38 Fed. Rep. 639; *Whitesides* v. *Hunt,* 49 Am. Rep. 441; *Mohr* v. *Miesen,* 49 N. W. Rep. 862. If under the guise of a contract for the future delivery of grain, the real intent is merely to speculate in the rise or fall of prices and the goods are not to be delivered, but one party is to pay the other the difference between the contract price and the market price of the goods at the date fixed for executing the contracts. Then the whole transaction constitutes a wager and is null and void. *Irwin* v. *Williar,* 110 U. S. 499; *Embrey* v. *Jemison,* 131 U. S. 336. The fact that no wheat was offered or demanded, shows that neither party expected the delivery of any wheat, but that they expected to

settle the contract on the basis of differences. *Lyon* v. *Culbertson*, 83 Ill. 33, (25 Am. Rep. 353;) *Washer* v. *Bond*, 19 Pac. Rep. 323; *Myers* v. *Tobias*, 16 At. Rep. 641; *Sprague* v. *Warren*, 41 N. W. Rep. 1113; *Watte* v. *Wikersham*, 43 N. W. Rep. 259; *Crawford* v. *Spencer*, 4 S. W. Rep. 713. Even if the plaintiffs acted as agents and paid defendants losses, yet knowing as they did, that the losses were incurred at gaming, they could not recover. *Farvia* v. *Gabell*, 89 Pa. St. 89; *Exrs* v. *Thomas*, 97 Pa. St. 278. Under statutes similar to that of Minnesota (the place of these contracts) money lost on option deals is recoverable. *Lester* v. *Buel*, 30 N. E. Rep. 821; *Dunn* v. *Bell*, 4 S. W. Rep. 41; *Pearce* v. *Foot*, 113 Ill. 228; *Lyons* v. *Hodgen*, 13 S. W. Rep. 1076; *Perry* v. *Gross*, 41 N. W. Rep. 799; *Lucas* v. *Cavanaugh*, 21 N. E. Rep. 306; *Copley* v. *Doran*, 1 N. Y. Supp. 888; *Peck* v. *Doran*, 10 N. Y. Supp. 401; *Watts* v. *Lynch*, 5 At. Rep. 458; *Grew* v. *Exchange*, 4 S. W. Rep. 38; *Kennedy* v. *Stout*, 26 Ill. App. 133; *Elder* v. *Talcott*, 43 Ill. App. 439. The defendant was entitled to recover his costs. *Thayer* v. *Holland*, 63 How. Pr. 179; *Griffin* v. *Brown*, 35 How. Pr. 372.

CORLISS, J. The plaintiffs are seeking to recover judgment against defendant for their commissions and for advances made by them on account of the sale and purchase of wheat by them as agents for defendant. Thus far they have been unsuccessful. The case was tried before the court, and judgment was rendered in favor of the defendant. The findings of the court amply sustain the judgment. But it is here urged that the evidence does not justify certain of the findings. The defense relied on was that the transactions in which the plaintiffs claim to have paid out moneys for the defendant were mere wagers on the price of wheat, and that the plaintiffs knew that the sole purpose of defendant was to gamble in wheat options, and not to enter into bona fide wheat contracts in which wheat was to be delivered to or by him thereunder. The plaintiffs were commission merchants in the City of Duluth, Minn., and were members of the Duluth Board of Trade. The defendant was and is an attorney in full

practice, residing and carrying on his professional business at Jamestown, N. D. In September, 1885, the defendant commenced shipping wheat to plaintiffs, to be sold by them for him in Duluth. These shipments continued for a time, and finally on October 30, 1885, the defendant sent to the plaintiffs the following telegram: "Buy ten May, ninety-eight or better, account of myself, and same account of J. E. Shoenberg." It is undisputed that this telegram was an order for the plaintiffs, as agents of defendants, to buy for him on the Duluth Board of Trade 10,000 bushels of wheat to be delivered in May, 1886, at not exceeding 98 cents a bushel. Thereafter defendant continued to send similar orders to the plaintiffs until the following June, when the plaintiffs closed him out, he having failed to keep good his margins. From time to time the various purchases made by plaintiffs for defendant were closed out on his orders. They were invariably closed out by the plaintiffs selling, under his directions, for future delivery, the same amount of wheat he had purchased. The first transactions resulted in a small profit to defendant, but, after purchasing 50,000 bushels of wheat for May delivery, the price fell rapidly, and when this purchase was closed out the following June the loss resulting from the transaction over and above moneys received by plaintiffs from defendant for margins was over $7,000. Plaintiff's claim that they were compelled to pay out on behalf of defendant in these transactions all the moneys for which they sue except their commissions, and they also seek to recover such commissions in addition to their alleged advances. The trial court found that all the transactions stated in the complaint as purchases and sales of wheat (except the sales of actual wheat shipped to plaintiffs by defendant for sale) were wagering transactions, in which no wheat was to be delivered or received by the parties thereto, and that the defendant employed the plaintiffs to make purchases and sales of wheat for future delivery in the City of Duluth, Minn., with the mutual understanding and agreement that no wheat was to be delivered or received by either party, and that such transactions were to be

mere wagers upon the rise and fall of the market price at Duluth; that all such purchases and sales were made pursuant to such mutual understanding; that all of such transactions were to be settled at a future time by the payment of differences, viz. the difference between the contract or purchase price and the market price on the day of settlement, and that neither party to the transaction should be required to deliver or receive any wheat; that all of such transactions involved simply gains or losses dependent upon the future rise or fall of the market price, and that no wheat was demanded, tendered, delivered, or received in any of the transactions. In the first place, we hold that the rights of the parties to this action are to be governed by the laws of Minnesota. The agents resided there, and the purchases and sales were all made there, and the defendant employed the plaintiffs as his agents for the express purpose of having such sales and purchases made there. No proof as to the laws of Minnesota, so far as this question is concerned, was made. Nor is there any finding on this point. We must therefore, presume the common law prevails there with respect to the questions of law which this case presents. We recognize the legal right of every one to speculate in every commodity which he does not own, and for which, as a commodity, he has no use. He may enter into a contract to buy or sell anything of value for the sole purpose of speculating,— with no other object in view than that of making profit out of the transaction; but he must in good faith bind himself to deliver or receive the thing sold or purchased. It is true that the undisclosed purpose of one of the parties to a contract not to deliver or receive the article contracted for will not affect the other party, who, relying on a contract calling for delivery, intends in good faith that the contract shall be carried out in all of its particulars. But when neither party intends that the property shall be delivered, where they both intend that the difference between the purchase price and the market value at the time specified shall be paid to the one who wins, then the transaction is a mere wager, and is void at common law in this country. See

cases cited in note to *Crawford* v. *Spencer*, 1 Am. St. Rep. at p. 759, 4 S. W. 713, and 92 Mo. 498. We must, therefore, presume that such a contract would be void in Minnesota.

This action, however, is not upon the several contracts of purchase and sale. It is brought to recover the advances and commissions of the agents who negotiated them. But the rule which prevents recovery upon a mere wagering contract applies with equal force to the agent who brings the parties together with knowledge that their purpose is not to enter into a legitimate agreement, but to gamble over the ever shifting price of the commodity to which their dealings relate. In this case it is expressly found that the plaintiffs knew that the purpose of the defendant was to gamble, and that he employed them in further-ance of that purpose, and that all the transactions in which the plaintiffs acted as agents for defendant were mere wagers on the price of wheat. That the agent cannot, under such circumstances, recover his commissions, or the advances made by him on behalf of his principal, is well settled. Having knowingly participated in an illegal transaction, the law will leave him without remedy in case of loss. *Crawford* v. *Spencer*, 92 Mo. 498, 4 S. W. 713; *Irwin* v. *Williar*, 110 U. S. 499, 4 Sup. Ct. 160; *Phelps* v. *Holderness*, (Ark.) 19 S. W. 921; *Embrey* v. *Jemison*, 131 U. S. 336-345, 9 Sup. Ct. 776. The findings are broad enough to embrace the fact that the persons with whom plaintiffs dealt in making purchases and sales for defendant had no thought of making or calling for delivery of the wheat, and we feel clear that the evidence fully sustains such a finding. But we are not compelled to rest our decision on this branch of the case upon this finding and the sufficiency of the evidence to sustain it. The intention of the other party to these transactions is immaterial. It is sufficient if the defendant's purpose was to gamble, and the plaintiffs knew of it when they went upon the Board of Trade to make such purchases or sales for the defendant. Being employed by the defendant to secure for him upon the Board of Trade mere

wagers upon the price of wheat, they would have no authority to enter into legal contracts on his behalf; and, if they should do so, and sustain losses, they could not recover such losses from him, because their acts resulting in such losses would be unauthorized. Moreover, having been instructed to make mere wagers on behalf of defendant, the law will presume, as against the agents in a case in which the other party to the transaction is not interested, that they obeyed such instructions, and that, therefore, they did not enter into legal contracts with others, binding the parties to deliver and receive the wheat agreed to be bought. There is no direct evidence as to the intention of the other parties to the several purchases and sales. The transactions on both sides appear to have been precisely alike, and it is a fair inference that the transactions which defendant intended should be mere wagers, which the plaintiffs, with knowledge of such intention, entered into on behalf of defendant, and which were in the form in which gambling in all kinds of commodities is carried on, were in fact intended by all parties thereto—principals and agents on both sides—to be mere bets with reference to the future price of wheat. That the intention of the other party to the contract is immaterial when the agent who is seeking to recover commissions and advances knows of the purpose of his principal to gamble, and loses the money for which he seeks judgment in furthering that purpose, is a well established doctrine. *Phelps* v. *Holderness*, (Ark.) 19 S. W. 921; *McCormick* v. *Nichols*, 19 Ill. App. 334, 337; *Beveridge* v. *Hewitt*, 8 Ill. App. 467, 482, 483; *Miles* v. *Andrews*, 40 Ill. App. 155, 163, 164; *Coffman* v. *Young*, 20 Ill. App. 82. In *Embrey* v. *Jemison*, 131 U. S. 336, 9 Sup. Ct. 776, the defendent in an action brought upon notes given in settlement of a claim of his agents for losses growing out of the purchase and sale of cotton for defendant set up as a defense that neither he nor his agents intended that actual cotton should ever be delivered. There was no averment that the other party to the transaction entertained the same purpose in making the contracts out of which the losses grew. And yet the court held that the answer

stated a good defense. See pages 338, 349, 131 U. S., and page 776, 9 Sup. Ct.

We come now to the question of the evidence to support the findings that the plaintiffs knew that the purpose of the defendant was to gamble, and that the losses for which they sue were suffered by them in furthering such illegal purpose. At the outset, we conclude that plaintiffs are right in the contention that the burden is on the defendant to establish by competent evidence the illegality of these transactions, and the participation of the plaintiffs in the unlawful purpose of the defendant. We might also safely assume that the sales and purchases made by plaintiffs on behalf of defendant were in form legal contracts, calling for the delivery of wheat specified therein. It is significant, however, that, while the witnesses on behalf of plaintiffs testify to actual sales, they do not pretend to state the terms of the contracts, nor was any writren contract of sale introduced in evidence. Without at least a written memorandum of these sales, they would not have been valid, and it is difficult to understand why these contracts were not reduced to writing if they were intended to embody the terms of a bona fide sale. It was the duty of the plaintiffs, as agents for defendant, to secure for him a contract he could enforce if they were making bona fide sales and purchases for him. The silence of the record in this respect is strong evidence that these alleged agreements were not in writing. Nay, there is positive evidence that they were not reduced to writing. One of the plaintiffs testified that formal contracts were not drawn up, but that there was always a full understanding as to the nature of the transactions. But, however perfect the likeness of a gambling transaction to the form and features of a legitimate sale, the legality of the dealings between the parties must rest ultimately upon their honest intention. Illegality is seldom guilty of the consummate folly of flaunting its defiance of law in the face of public sentiment—of furnishing itself the evidence of its violation of law. To escape the penalties of breaking the law, it will always put on the "suits and trappings" of honest

transactions. Mere wagering contracts invariably wear the garb of bona fide sales. This is common knowledge. Myriads of gambling operations are daily arranged by two interested brokers, who fatten on the folly of their dupes, in the decent and decorous habiliments of lawful business transactions. The *naivete* of a tribunal which in such cases should unquestioningly take the semblance for the substance would, indeed, be pitiable, if it did not excite derision and contempt. The courts have always sought to pierce the disguise, and ascertain the real intention of the parties. *Whitesides* v. *Hunt,* 97 Ind. 191; *Melchert* v. *Telegraph Co.,* 11 Fed. 193; *Edwards* v. *Hoeffinghoff,* 38 Fed. 639; *Embrey* v. *Jemison,* 131 U. S. 336, 344, 9 Sup. Ct. 776; *Irwin* v. *Williar,* 110 U. S. 499, 4 Sup. Ct. 160; *Mohr* v. *Miesen,* (Minn.) 49 N. W. 862. Said the court in *Melchert* v. *Telegraph Co.,* 11 Fed. 193: "In seeking to ascertain the intentions of parties to such transactions as the one under consideration, it is evident that it will not do to place any great stress upon the mere terms of the contract, or upon their own declarations, whether under oath or not. Parties under such contracts will always seek to give them the form and semblance of legality, and all our experience admonishes us to receive with extreme caution, if not absolute distrust, what parties charged with transactions apparently illegal say respecting the innocency of their own intentions." In *Edwards* v. *Hoeffinghoff,* 38 Fed. 639, Judge Sage says: "No matter what the form of the contract, no matter how many colorings of reality and genuine dealing are thrown about the transaction, if, piercing all these disguises, the court or jury see that all these forms are mere shams, and that there was in fact no actual dealing in the article itself, but that forms were adopted as a mere semblance to deceive and evade the law, it is the duty of the court and jury to tear away the disguise, and treat the transaction as it is." In *Embrey* v. *Jemison,* 131 U. S. 344, 9 Sup. Ct. 776, the court said of the transaction there before it: "If this be not a wagering contract under the guise of a contract of sale, it would be difficult to imagine one that would be of that character. The mere form

of the transaction is of little consequence. If it were, the statute against wagers could easily be evaded." What, then, were the intentions of defendant? Was his purpose merely to gamble? Did plaintiffs have knowledge of such purpose? Did they aid him in carrying it out? Were these losses incurred by them in so doing? The evidence fully sustains the finding of the court with respect to the intention of the defendant. He testified that his sole object was to make wagers on the price of wheat. The character of the transactions, and the evidence of all the parties, fully corroborate his statement.

The only remaining question is whether the plaintiffs were aware of defendant's purpose when they went upon the Board of Trade to make for him the several purchases and sales out of which these losses grew. If they did, it is an inevitable inference that they participated in his gambling project, and actually aided him therein. We are clear that the circumstances surrounding these transactions fully sustain the finding of such knowledge and participation. The order to purchase wheat came to plaintiffs in the form in which mere orders to gamble in the price of wheat are sent by speculators to brokers. It is a well known fact that a large percentage of such transactions are only wagering operations. No one knew this better than the plaintiffs when they received the defendant's different orders to buy and sell. At no time during all these transactions was there a suggestion from either plaintiffs or defendant that a bushel of this wheat was to be delivered to or by the defendant. He was never informed of the names of the different brokers of whom these purchases or to whom these sales were made. He never knew who were the principals back of such brokers with whom he had entered into contracts calling for the delivery, on plaintiffs' theory, of thousands of bushels of wheat. His indifference to this matter of delivery all through these transactions was certainly suggestive to plaintiffs, who were familiar with such indifference, and the reasons for it, though having witnessed it in a multitude of similar transactions. From the very beginning the defendant

pursued the course of closing out these purchases long before the day of delivery had arrived; in some cases ordering sold, within a few days after the purchase, all or a portion of the wheat purchased for May delivery. What did this indicate to the mind of the plaintiffs, if it did not tend to show them that defendant was merely gambling in options? The defendant was a lawyer, as plaintiffs well knew. Why was he buying thousands of bushels of wheat for future delivery, and then closing out the transaction in a short time? It is also singular that the defendant should take no pains to inquire as to the responsibility of the persons of whom the plaintiffs had purchased wheat for him for May delivery, if the transactions were ordinary business transactions, and not the usual wagering deals upon the Board of Trade. The purchaser in an honest business sale naturally wishes to know something of the pecuniary responsibility and of the character of the man who has agreed to deliver property to him at a certain time for a specified price. If the vendor will not perform his contract, and cannot be made to pay damages for breach of it, the contract is of no value to the purchaser. How could the plaintiffs expect that the defendant would regard a bona fide purchase by him closed out, and himself released from all further liability on the contract by ordering a new contract to be made with another person,—a contract of sale,—thus increasing, rather than extinguishing, his liability, if the two transactions were bona fide sales? The natural mode of wiping out an obligation is to reach the party who holds it, and agree with him as to the terms on which he will release the other party who desires to be discharged. Yet the plaintiffs knew that the defendant was willing to pursue a widely different course, and close out his purchase at a profit, by obligating himself to sell more wheat to another without securing release from the contract of purchase which he desired to wipe out. It is only on the theory that these transactions were understood by the defendant to be mere wagers on the price of wheat that they can be accounted for when we consider the object of the defendant in entering into them,—*i. e.* to close

out his pretended purchases at a profit. Where the purchase and the sale are legitimate transactions, one cannot count in advance on a profit, although he has contracted to settle at a higher price than he has agreed to pay for the same commodity. The one who has agreed to pay him the higher price may refuse to perform the contract, and may be without financial responsibility. Indeed, the dealer may, in such case, find, when the time for delivery arrives, that he has actually lost, as the market price of the commodity may then be lower than the price he has agreed to pay for it, and the irresponsible purchaser in the other contract may refuse to carry out his agreement. Defendant's belief, which his communications and conduct made manifest to the plaintiffs, that both transactions, the purchase and the sale, were at an end, and that he had won or lost, as the case might be, must have furnished to the plaintiffs very cogent evidence that defendant did not regard these dealings as litigimate purchases and sales, but only in the light of wagers on the market price of wheat. Plaintiffs knew that defendant had no use for the wheat he ordered purchased, and they took no pains to ascertain whether he had sufficient financial ability to pay for the large purchases he made from time to time on the theory that he intended to receive and pay for the wheat. Defendant never furnished any money to make the different purchases with, nor was he ever called on by the plaintiffs to furnish them with money for that purpose. He merely sent them funds from time to time to keep good his margins as he bought and then sold. It is true that plaintiffs insist that the sales were genuine, and that they did not know of defendant's purpose to gamble. But courts are not bound by the testimony of interested parties, but may look to the surrounding circumstance, to ascertain the true character of the transactions. Some of the correspondence between the parties furnishes strong evidence that plaintiffs knew that defendant's sole purpose was to gamble. On February 5, 1886, defendant wrote to plaintiffs a letter, in which the following sentence appears: "I now see that you have my actual wheat account mixed with my option

account." In this letter he distinctly notifies plaintiffs that his option account is not an account involving the purchase and sale of "actual wheat." The two expressions are used to distinguish the two classes of transactions; one relates to actual wheat, the other not. He speaks of the account of the fictitious wheat transactions as the "option account." Fictitious wheat transactions they must be if they do not relate to actual wheat. On the 15th day of December, 1885, defendant wrote plaintiffs as follows: "When you can buy 20 May at 95 cents, take it. I have 5,000 wheat in granary. Do you handle wheat in Minneapolis? By the way, I want you to handle options for me at one-eighth." On the 4th day of December, 1885, plaintiffs wrote to defendant a letter, in which they said: "Our market opened at 98⅛ for May, developed strength througout the day, and closed at one dollar bid. We are very glad you had the pluck to hold on, and believe that wheat is a purchase on all good breaks. Still, if you get a fair profit, we would advise you to close it out, taking chances of getting it back at cheaper figures. We have had a very good advance, and any further bulge will doubtless be followed by some reaction." In this letter plaintiffs themselves advise this man, who, according to their theory, had bought actual wheat, to close it out, and buy it back cheaper. In other words, they plainly tell him that the delivery of the wheat is not what any one is thinking of. They advise him to close up the old bet as soon as he can secure a fair profit, and then make another bet when wheat has again fallen in price.

Our attention has been called to one of the rules of the Duluth Board of Trade, and to the testimony that it was in force when these transactions were had, and that they were entered into by plaintiffs with reference to such rule. It declares as follows: "In all cases of sale of produce, the party or parties selling shall deliver the property sold at the time specified, unless the purchaser shall consent to accept or pay the difference in cash, when so requested to do by the seller. In all cases, however, the buyer shall have the right to demand the property, if he so

elects." This rule confirms our views that these transactions were known by plaintiffs to be mere wagering deals. In this very rule the purchaser is given the option to accept or pay the difference in price when the seller so requests him to do. In other words, the rule provides that the parties may agree to do what every layman knows they can agree to do without any such rule. Why mention this right to agree to settle by paying differences when it is a right which exists independently of any rule? The reason is obvious, when the almost universal practice is considered. When brokers, by their rules, inform their speculating customers that no delivery is necessary if the parties agree to dispense with it, and this is followed by the almost uniform practice of settling by paying differences, we are constrained to believe that no delivery was intended from the very outset of any of these transactions, and that the brokers were well aware of it. With the obvious purpose of covering up the gambling character of these operations, they establish a rule that there shall be a delivery, unless both parties agree to dispense with it; knowing that both parties will always so agree. It is significant, too, that this rule applies only to actual sales. This still leaves the question open whether the parties intended an actual sale or were merely wagering on the price of the commodity ostensibly bought and sold. This rule does not apply at all if the deal is a mere wager. It does not declare that every transaction on the Board of Trade shall be a bona fide sale, but merely provides that, if it is a sale, the parties must deliver, unless they agree to settle by paying differences. Moreover, it does not appear when the consent may be given to settle in this way,—whether after the transaction is consummated, or at the time the deal is made. If at the time the deal is made, then this understanding of itself renders the operation a mere wager, for it is an understanding from the very beginning that there shall be no delivery. But the real purpose of the parties to gamble, when it is once found to exist, cannot successfully escape the condemnation of the law, whether the false appearance of an honest sale is put on by rules of

boards of trade or by the devices of executing legal contracts in form. It has been frequently held that circumstances similar to those which surround these transactions amply sustain a finding that the dealings between the parties were mere wagers, when the circumstances were no more convincing than in this case. *Mohr* v. *Miesen*, (Minn.) 49 N. W. 862; *Phelps* v. *Holderness*, (Ark.) 19 S. W. 921; *Cobb* v. *Prell*, 15 Fed. 774; *Crawford* v. *Spencer*, 92 Mo. 498, 4 S. W. 913; *Miles* v. *Andrews*, 40 Ill. App. 155; *Beveridge* v. *Hewitt*, 8 Ill. App. 482; *Colderwood* v. *McCrea*, 11 Ill. App. 546; *Watte* v. *Wickersham*, (Neb.) 43 N. W. 259; *Sprague* v. *Warren*, (Neb.) 41 N. W. 1113. We would expect the plaintiffs to give to these gambling transactions the appearance of honest sales, and to insist in their testimony that they were what they appeared to be. But, although the hands may seem to be the hands of Esau, the voice is unmistakably the voice of Jacob.

One of the errors assigned relates to the admission of the testimony of the defendant with reference to statements made to him by one Nichols, the agent of the plaintiffs, touching the character of the business he urged defendant to carry on with plaintiffs. In substance, the defendant testified that this agent informed him that these transactions which the agent induced him to enter into with plaintiffs would be mere wagers on the price of wheat; that in them no wheat would be delivered by either party to the different deals. Plaintiffs here contend that the reception of this evidence was error, because the agent, Nichols, had no authority to represent them, except in the matter of securing shipments of actual wheat, to be sold by plaintiffs for the shippers, as their agents in Duluth. There is no attempt in this case to enforce against plaintiffs any liability because of any contract made by this agent on their behalf; but it is claimed that the case shows that Nichols had no authority to act for them except in legitimate transactions, and that, therefore, any knowledge he may have acquired that the defendant intended to gamble would not affect them; and hence it is contended that it was prejudicial error to receive this evidence, as the court may have considered it as

evidence of knowledge on the part of plaintiffs of defendant's illegal purpose. But this evidence was admissable for the purpose of strengthing defendant's testimony that his sole purpose was to gamble; to show that he had ground for believing that he was only gambling, and that he so understood the subsequent transactions. Its value for this purpose would not depend upon the authority of the agent, but upon the mere fact that such agent had put into defendant's mind the thought of engaging in such gambling transactions. As it was admissable for this purpose, it was not error to receive it. We cannot assume that the court considered it as proving another fact which it had no legal tendency to prove. On the contrary, it is a fair presumption that the court, after having lawfully received the evidence to establish one fact, regarded it as incompetent to prove another fact, which could not legally be established in that way. Especially must this be the presumption when it appears, as is done in this case, that the latter fact is almost conclusively established by other evidence.

We come now to the second branch of the case. Defendant set forth in his answer as a counterclaim that he had paid to plaintiff's certain sums of money as margins in these gambling transactions, and asked that judgment for this money be rendered against the plaintiffs in his favor. It is undisputed that defendant did in fact pay to the plaintiffs as margins the sum of $4,259.68. The right to recover back this money, it is conceded by defendant's counsel, rests upon the Minnesota statute. It seems to be agreed between counsel for the plaintiffs and defendant that there is no common law liability to refund such money, and that the rights of the parties are governed by the laws of Minnesota, where the transactions were carried on, and not by the laws of this state. The statute of Minnesota relied on by defendant provides that: "Whoever by playing at cards, dice or other game, or by betting on the hands or sides of such as are gambling, loses to any person so playing or betting any sums of money or any goods whatever and pays or delivers the same or

any part thereof to the winner, the person so losing, and paying and delivering the same, may sue for and recover such money by a civil action before any court having competent jurisdiction." Gen. St. Ch. 99 § 13. Without attempting, in this opinion, an analysis of the statute, we are entirely free from doubt in our view that it does not relate to moneys lost in dealing in options. Under similar statutes the courts have uniformly held against the liability of the person receiving the margins to refund them. *Sondheim* v. *Gilbert*, 117 Ind. 71, 18 N. E. 687; *Shaw* v. *Clark*, 49 Mich. 384, 13 N. W. 786; *Bank* v. *Harrison*, 10 Fed. 243. The cases cited by defendant's counsel arose under very different statutes, and for that reason they are not in point. We therefore hold that the statute gives defendant no right to recover the moneys paid to plaintiffs for margins. That there is no liability independently of statute is not open to discussion. The law leaves both parties where it finds them. *Higgins* v. *McCrea*, 116 U. S. 671, 6 Sup. Ct. 557; *White* v. *Barber*, 123 U. S. 392, 8 Sup. Ct. 221; *Kahn* v. *Walton*, (Ohio Sup.) 20 N. E. 210.

The trial court erred, however, in refusing costs to defendant. Plaintiffs, having failed to establish their cause of action, were not entitled to costs; and in all cases in which the plaintiff is not entitled to costs the defendant recovers costs as a matter of course. His rights do not depend upon his sustaining a counterclaim which he may have interposed. It depends solely upon his preventing a recovery of costs by the plaintiff. Had defendant set up no counterclaim, there would have been no doubt about his right to costs. He is in no worse position because he did interpose a counterclaim, and failed to sustain it *Ury* v. *Wilde*, (Super. N. Y.) 3 N. Y Supp. 791.

On plaintiffs' appeal, the judgment, so far as it dismisses the action, is affirmed. On defendant's appeal, the judgment is modified by allowing to defendant his costs in the District Court.

As so modified, the judgment is in all respects affirmed. All concur.